IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellee*,

*v.*

**EDWARD LITTLETON MCCAULEY,**
*Appellant*.

---

No. CR-20-0031-AP
Filed May 15, 2026

---

Appeal from the Superior Court in Maricopa County
The Honorable Frank W. Moskowitz, Judge
No. CR2014-155906-001
**AFFIRMED**

---

COUNSEL:

Steve Koestner, Colin F. Stearns, Grace M. Guisewite (argued), Office of the Legal Advocate, Phoenix, Attorneys for Edward Littleton McCauley

Kristin K. Mayes, Arizona Attorney General, Jason D. Lewis, Deputy Solicitor General, Section Chief of Capital Litigation, Jeffrey L. Sparks (argued), Senior Litigation Counsel, Capital Litigation Section, Attorney General's Office, Attorneys for State of Arizona

---

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICE BEENE joined.* JUSTICE BOLICK authored a concurring opinion.

---

JUSTICE KING, Opinion of the Court:

¶1         This appeal arises from Edward McCauley's conviction for first degree murder and his resulting death sentence. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A)(1). We affirm McCauley's conviction and sentence.

## BACKGROUND

¶2         On the night of November 23, 2014, McCauley went to the residence of his estranged wife, D.M., and waited outside in a car for her to leave for work. Around midnight, McCauley exited the car carrying a .45 caliber pistol and confronted D.M. as she entered her vehicle. A witness heard D.M. scream "no" a few times during the confrontation. McCauley shot D.M. eight times. The bullets struck D.M. in various locations on her body, including her hands, arms, neck, torso, and heart. At about 12:03 a.m. (now the morning of November 24), McCauley fled the scene.

---

* Justice William G. Montgomery is recused from this matter. Also, briefing and oral argument in this case occurred before Justice Maria Elena Cruz was appointed to the Arizona Supreme Court. Justice Cruz did not participate in this case.

¶3        McCauley sent a series of text messages to D.M.'s family immediately after the murder.  McCauley sent the first text to D.M.'s sister at 12:04:04 a.m.:

> Over 22 years she wouldn't even suck my dick a few months before she did this she would suck that dick 3&4 times a day. I begged her not to fuck me over many times please don't fuck me , you know I did now I just killed your seester. :- ) she didn't need to do me like that . KARMA she pays the karma for all the fucked up weman in my life my mom your mom you Tuesday and of corse [D.M.] . Teach your kids you fuck over the wrong guy and holy crap.

McCauley attached an image of D.M. performing oral sex on him.

¶4        McCauley sent the second text to D.M.'s daughter at 12:05:39 a.m.:

> I killed her. Your mother wasn't even woman enough to suck my cock for 22 years and then six month's before she did this she would suck that dick 3 & 4 times a day . Who's your daddy now bitch . I just killed your mommy . She tought you how you can use that lil pussy to destroy men who are good to you . Be careful that same good man can kill you for it . KARMA finally reached up and bit YOUR family's on the clit . I talk to you like this because I have no respect for you Tuesday . Take care of your brother . That family tatt should be smaller[.]

McCauley attached a different image of D.M. performing oral sex on him.

¶5        McCauley sent the final text to D.M.'s mother at 12:06:02 a.m.:

> It only hurts if it effects you , you old whore I just killed your whore daughter . She ain't family any more either . KARMA is a bitch its all your fault . :- ) she's not family anymore either . I have no resect for any of you.

McCauley attached two different images of D.M. performing oral sex on him.

**¶6** A neighbor called 911. When police arrived, they discovered D.M.'s body slumped over in the front passenger seat of her vehicle. D.M. had succumbed to her injuries and was pronounced dead.

**¶7** A detective met with D.M.'s family and learned about the texts. Police obtained a warrant to search McCauley's residence. During the search, police found a calendar in his bedroom with November 23, 2014 outlined in red marker and "judgment day" hand-written on that date.

**¶8** A grand jury indicted McCauley for first degree murder. The State noticed its intent to seek the death penalty, alleging he committed the murder "in an especially heinous, cruel or depraved manner" pursuant to A.R.S. § 13-751(F)(6) (2012) (reorganized to § 13-751(F)(4) in 2019).

**¶9** In the guilt phase, defense counsel told the jury that "Mr. McCauley shot and killed his wife" but "did not do it with premeditation," and asked jurors to consider the instructions addressing the lesser offenses of second degree murder and manslaughter. The trial court instructed the jury on first degree murder, second degree murder, and manslaughter by sudden quarrel or heat of passion. The jury found McCauley guilty of first degree murder.

**¶10** In the aggravation phase, the jury found that McCauley committed the murder in an especially heinous or depraved manner under § 13-751(F)(6) (2012). The jury did not find that the murder was committed in an especially cruel manner.

**¶11** In the penalty phase, McCauley offered various types of mitigation evidence, the State presented evidence to rebut the significance of his mitigation evidence, and D.M.'s daughter and sister provided victim impact statements. The jury sentenced McCauley to death, and this appeal ensued.

## DISCUSSION

### A. Persistent And Pervasive Prosecutorial Error[1]

**¶12**        McCauley alleges the prosecutor engaged in persistent and pervasive prosecutorial misconduct that deprived him of due process and a fair trial. He argues these instances individually, or in the alternative cumulatively, warrant reversal. "Prosecutorial error 'broadly encompasses *any conduct* that infringes a defendant's *constitutional rights*. It sweeps in prosecutorial conduct ranging from inadvertent error or innocent mistake to intentional misconduct.'" *State v. Rushing*, 573 P.3d 72, 90 ¶ 58 (Ariz. 2025) (quoting *State v. Murray*, 250 Ariz. 543, 548 ¶ 12 (2021)); *see also State v. Romero*, __ P.3d __ ¶ 20 (May 15, 2026) (holding that "[a] prosecutor's intent is not a prerequisite to establishing prosecutorial error" or obtaining relief). We therefore use the term "prosecutorial error" when referring to all of McCauley's claims in Part A.

**¶13**        To prevail on a claim of prosecutorial error, "a defendant must demonstrate that the prosecutor's [error] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Murray*, 250 Ariz. at 548 ¶ 13 (quoting *State v. Morris*, 215 Ariz. 324, 335 ¶ 46 (2007)). "To that end, a defendant must demonstrate that (1) [error] exists and (2) a reasonable likelihood exists that the [error] could have affected the jury's verdict, thereby denying defendant a fair trial." *Id.* (quoting *Morris*, 215 Ariz. at 335 ¶ 46) (citation modified). In assessing multiple claims of prosecutorial error, "we first review each allegation individually for error." *State v. Payne*, 233 Ariz. 484, 511 ¶ 106 (2013). "We then consider whether the cumulative effect of individual allegations 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26 (1998)).

---

[1] The prosecutor in this case consented to disbarment in 2020. *See In the Matter of a Member of the State Bar of Arizona, Juan Martinez*, PDJ 2019-9008, Judgment of Disbarment (July 17, 2020).

**¶14**         "[W]e review objected-to claims for harmless error and unobjected-to claims for fundamental error." *State v. Hulsey*, 243 Ariz. 367, 388 ¶ 88 (2018).  "Harmless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *State v. Henderson*, 210 Ariz. 561, 567 ¶ 18 (2005).  In contrast, fundamental error review places the burden on the defendant to demonstrate "that an error was fundamental by establishing one of three prongs: '(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial.'" *Rushing*, 573 P.3d at 80 ¶ 15 (quoting *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018)).  "'If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice' by demonstrating that 'without the error, a reasonable jury could have plausibly and intelligently returned a different verdict.'"  *Id.* (quoting *Escalante*, 245 Ariz. at 142 ¶ 21, 144 ¶¶ 29–31).  "But if the defendant establishes fundamental error under the third prong, 'he has shown both fundamental error and prejudice, and a new trial must be granted.'"  *Id.* (quoting *Escalante*, 245 Ariz. at 142 ¶ 21).

## 1.  The Victim's Point Of View

**¶15**         McCauley claims the prosecutor erred by asking the jury to view the crime from the victim's point of view during the aggravation phase.  In closing, the prosecutor discussed the murder and stated:

> Examine it, now, from the victim's point of view. [D.M.], look at it from her point of view, how she died . . . . The term "cruel" focuses on the victim's pain and suffering . . . . [W]ho is the person that's experiencing this pain? It's the victim. Who is the person who is experiencing this mental distress? Well, it's the victim. And the only way to look at that is through her eyes.

The defense objected to the "victim's point of view" reference, and the objection was overruled.

¶16 "A prosecutor has wide latitude in closing argument, but may not make arguments that appeal to the jury's fear or passion." *State v. Lynch* ("*Lynch II*"), 238 Ariz. 84, 100 ¶ 48 (2015), *rev'd on other grounds*, *Lynch v. Arizona* ("*Lynch III*"), 578 U.S. 613 (2016). "This includes inviting jurors to place themselves in the victim's position because doing so plays on the jurors' fear of the defendant or sympathy for the victim." *Id.* In *Lynch II*, the prosecutor improperly placed jurors in the victim's position right before the murder and appealed to their individual fears by stating: "I don't think *you* can even imagine," "*[y]ou* cannot move," "they're manhandling *you*," and "they are going to cut *your* throat." *Id.* at 100 ¶¶ 47, 49 (emphasis added).

¶17 Here, the prosecutor's statements focused on the jury's examination of D.M.'s physical pain and mental anguish in the context of considering the "especially cruel" aggravator that was squarely before the jury. *See State v. Johnson*, 247 Ariz. 166, 183 ¶ 28 (2019) ("A murder is especially cruel if the victim consciously experiences physical abuse or mental anguish before death." (quoting *State v. Bolton*, 182 Ariz. 290, 311 (1995))). His statements are not analogous to *Lynch II*, as the emphasis was on D.M.'s physical pain and mental anguish, not that of the jurors. The statements were relevant to the "especially cruel" aggravator that was before the jury and did not improperly appeal to the jury's fear or passion, and the jury ultimately rejected the "especially cruel" aggravator. The prosecutor did not commit error.

## 2. Misstating The Law

¶18 McCauley claims the prosecutor misstated the law in the penalty phase pertaining to what the jury may consider in mitigation, the significant impairment mitigating circumstance, and age and work history as mitigating circumstances. *See State v. Serna*, 163 Ariz. 260, 266 (1990) ("The state may not misstate the law to the jury.").

### a. Mitigating Circumstances

¶19 In closing, defense counsel said that mitigating circumstances can be "anything that you have seen, anything at all, that you consider merciful for Eddie McCauley. Anything that you individually feel, that can

be mitigation to you . . . . It is anything that matters to you . . . . Mitigation is completely wide open." In response, the prosecutor told jurors:

> "Anything is mitigation," is what you were told. No . . . . There's a restriction. There's a boundary. There's a fence. There's a moat. However you want to call it, there's a boundary. So long as they relate. They have to relate to any sympathetic or other aspect of the defendant's character. The color of the sky doesn't have anything to do with the defendant's character.
> . . . .
> [A]ny connection or lack of connection may impact the quality and strength of the mitigation evidence. The State proposes to you, that if there is no connection—"nexus" is the term I'm going to use—between what they are proposing to you and the murder, then, by necessity, that's something you can't consider. And it is the State's position that that probably . . . is not a mitigating circumstance . . . . But you are not required to find that there is a connection between a mitigating circumstance and the crime committed in order . . . to consider the mitigation evidence.

The defense objected, and the court responded that counsel could address the issue in rebuttal.

¶20            The prosecutor also argued that testimony from defense expert Dr. Toma demonstrated that McCauley's depression and brain injury (from a motorcycle accident in 1995) did not cause him to commit the murder; thus, the State's position was these were not mitigating circumstances. The defense did not object. In rebuttal, the defense told jurors there does not have to be a nexus between a mitigating circumstance and the crime.

¶21            "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S.

586, 604 (1978) (footnote omitted). "[A] State cannot preclude the sentencer from considering 'any *relevant* mitigating evidence' that the defendant proffers in support of a sentence less than death." *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) (emphasis added) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). Mitigating evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)); *see also* Ariz. R. Evid. 401. However, "gravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability." *Tennard*, 542 U.S. at 286.

¶22        As this Court explained in *State v. Villalobos*, a "jury cannot be precluded from hearing mitigation evidence because it lacks a causal nexus to the murder," but once the jury has heard all mitigation evidence, "'there is no constitutional prohibition against the State arguing that evidence is not particularly relevant or that it is entitled to little weight.'" 225 Ariz. 74, 83 ¶ 38 (2010) (quoting *State v. Anderson*, 210 Ariz. 327, 350 ¶ 97 (2005)). A jury, therefore, may consider a lack of causal nexus when it assesses the quality and strength of mitigation evidence. *Id.*

¶23        Here, by arguing that mitigation "is completely wide open" and mitigation means "anything at all," "anything that you individually feel," and "anything that matters to you," the defense incorrectly implied that jurors could consider irrelevant factors or even factors beyond the evidence presented at trial. *See* A.R.S. § 13-751(G) (stating the trier of fact shall consider as mitigating circumstances any factors "relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense"); *Rushing*, 573 P.3d at 87 ¶ 43 ("[A] jury cannot consider 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.'" (quoting *State v. Carreon*, 210 Ariz. 54, 70 ¶ 84 (2005))).

¶24        The prosecutor's statements were an attempt to refute the defense's suggestion by explaining what was relevant for mitigation

purposes. *See State v. Alvarez*, 145 Ariz. 370, 373 (1985) ("Prosecutorial comments which are a fair rebuttal to areas opened by the defense are proper."). The prosecutor told jurors that "any connection or lack of connection may impact the quality and strength of the mitigation evidence." He then explained that if something has no connection ("nexus") between the mitigation and the murder, then "that's something you can't consider," but he prefaced this comment with "the State proposes to you" and finished with "[b]ut you are not required to find that there is a connection between a mitigating circumstance and the crime" to consider the mitigation evidence. In the context of the entire argument, the reference to "nexus" was an argument about considering the quality and strength of McCauley's mitigation evidence. *See Tennard*, 542 U.S. at 286; *Villalobos*, 225 Ariz. at 83 ¶ 39 (explaining "the state may fairly argue that the lack of a nexus to the crime diminishes the weight to be given alleged mitigation"). The jury was not precluded from considering McCauley's mitigation evidence and the prosecutor did not commit error.

### b. Significant Impairment

**¶25** Defense expert Dr. Bigler testified that McCauley had a "significant brain injury," and people with this type of brain injury are more likely to develop depression. Dr. Toma and the State's expert, Dr. DeMarte, also testified that McCauley suffered from major depressive disorder at the time of the murder. The defense argued that McCauley's brain injury and major depressive disorder were mitigating circumstances under A.R.S. § 13-751(G)(1) (providing the trier of fact shall consider the following mitigating circumstance: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."). In closing, the prosecutor argued the significant impairment mitigating circumstance pertains to "the defendant's capacity to appreciate the wrongfulness of his conduct," which is about "whether or not he knew right from wrong," and "[t]here hasn't been any evidence that showed he didn't know that shooting her in the head was wrong." The defense did not object.

**¶26** McCauley claims the State improperly altered the standard under § 13-751(G)(1) because the "defense was not required to show that

Mr. McCauley did not know right from wrong to prove the statutory mitigator." But this Court has described § 13-751(G)(1)'s "capacity to appreciate the wrongfulness of his conduct" as the capacity to "know[] right from wrong." *See, e.g.*, *State v. Medina*, 232 Ariz. 391, 412 ¶¶ 100–104 (2013); *State v. Doerr*, 193 Ariz. 56, 71 ¶¶ 73–76 (1998); *State v. Schackart*, 190 Ariz. 238, 251 (1997). And the prosecutor repeatedly stated the issue was whether McCauley's brain injury or mental health issues impacted his ability to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law, consistent with § 13-751(G)(1) and the jury instructions.

**¶27** McCauley also claims the prosecutor improperly told jurors they could not consider the brain damage as a mitigating circumstance. But the prosecutor did not tell jurors they could not consider the brain injury evidence. The prosecutor's argument, in context, was that any brain damage was minimal, McCauley exhibited behaviors pre-accident (with his first wife ("ex-wife")) that were similar to his behaviors post-accident (with D.M.), and the evidence presented did not support the brain injury as a mitigating circumstance. *See Tennard*, 542 U.S. at 284–86. Moreover, the jury was properly instructed that it could consider any relevant evidence as mitigation, and each juror would individually assess whether mitigation was of such quality or value to warrant leniency. *See Villalobos*, 225 Ariz. at 83 ¶ 39. The prosecutor did not commit error.

### c. Work History

**¶28** The defense presented evidence of McCauley's work history, as the former owner of a trucking company and a truck driver with a Class A license. In response, the prosecutor presented evidence that McCauley was terminated from his job for failing a drug test, and the Department of Transportation revoked his license. The prosecutor also argued that most people in this country are employed, people are paid for work, and there has to be something about this particular defendant for work history to be a mitigating circumstance. The defense objected, and the court responded that counsel could address the issue in rebuttal.

**¶29** McCauley argues the prosecutor improperly told jurors they could not consider his work history as a mitigating circumstance. But the

prosecutor's argument, in context, was that McCauley's evidence did not support work history as a mitigating circumstance because his work history was not particularly exemplary. The prosecutor did not tell jurors they were precluded from considering McCauley's work history. The prosecutor's argument that his work history was not a persuasive mitigator was not error. *See Tennard*, 542 U.S. at 284–86. Moreover, the jury was instructed they could consider "work history" as a mitigating circumstance. The prosecutor did not commit error.

### d. Age

**¶30** The defense argued to the jury that McCauley's age was a mitigating circumstance. *See* A.R.S. § 13-751(G)(5) (providing for the consideration of "defendant's age" as a mitigating circumstance). In response, the prosecutor argued that "[a]ge is not limited solely to chronological age" and in determining whether this mitigating circumstance exists, jurors may also consider a defendant's level of intelligence, ability to be manipulated by others, involvement in the crime, and past experience. The prosecutor noted "[t]he effect you give to any mitigation is left to your sound discretion" and "[t]he State would submit to you that given his age . . . [a]s an older individual who is 58 years old, he should have known better. This applies to people of young age, not to his mature age." The defense objected, and the court responded that counsel could address the issue in rebuttal. Then, in rebuttal, the defense reaffirmed that mitigation is up to the jury, and the jury could look at his entire life when deciding the sentence.

**¶31** McCauley argues the prosecutor improperly told jurors they could not consider McCauley's age as a mitigating circumstance. This Court has held "[t]he mitigating weight of a defendant's age depends upon the 'defendant's level of intelligence, maturity, involvement in the crime, and past experience.'" *State v. Poyson*, 250 Ariz. 48, 54 ¶ 26 (2020) (quoting *State v. McKinney*, 245 Ariz. 225, 227 ¶ 11 (2018)). And the jury instruction here explained that "[a]ge is not limited solely to chronological age" and jurors "may also consider, but are not limited to considering, the defendant's level of intelligence, maturity, ability to be manipulated by others, involvement in the crime and past experience when determining whether this mitigating circumstance exists." The prosecutor's argument,

in context, was that jurors should not give weight to McCauley's age given the related *Poyson* factors. *See Poyson*, 250 Ariz. at 54 ¶ 26. The prosecutor did not foreclose the jury from finding the mitigating circumstance based on chronological age alone. In fact, the prosecutor told jurors that if they find McCauley's age to be a mitigating circumstance, they must consider his age in determining his sentence. The prosecutor did not commit error.

### 3. The Prosecutor's Statements About Evidence

**¶32** "[I]t is not proper to misstate evidence," *State v. Cannon*, 148 Ariz. 72, 77 (1985), and "[c]ounsel's questioning and argument . . . cannot make insinuations that are not supported by the evidence," *Hughes*, 193 Ariz. at 85 ¶ 59. *See also Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986). But "[c]ounsel is given 'wide latitude' in closing argument to 'comment on the evidence and argue all reasonable inferences' from it." *State v. Moody*, 208 Ariz. 424, 464 ¶ 180 (2004) (quoting *State v. McDaniel*, 136 Ariz. 188, 197 (1983)). And "[w]hen defense counsel can correct the misstatement at trial, . . . we are hesitant to find reversible error." *Lynch II*, 238 Ariz. at 96 ¶ 26; *see also Cannon*, 148 Ariz. at 77–78 ("Defense attorney's failure to [correct a misstatement of evidence] enhances our belief that the misstatement of the evidence was not prejudicial to appellant's fair trial.").

#### a. Statements About Substance Abuse Evidence

**¶33** In closing, the prosecutor addressed the significant impairment mitigator and McCauley's marijuana use, telling jurors: "[N]o one presented any evidence as to what the effects of the marijuana were. So how can you possibly say that it impacted [McCauley's] ability to appreciate the wrongfulness of his conduct?" The prosecutor argued McCauley knew the wrongfulness of his conduct because he waited for D.M. and immediately fled the scene after killing her. The defense did not object.

**¶34** McCauley argues the prosecutor misstated evidence about substance abuse in light of Dr. Bigler's testimony. Dr. Bigler had testified that marijuana use can negatively interact with an underlying brain injury. But Dr. Bigler also testified (1) marijuana primarily produces a physiologic change in the brain, not a structural change like McCauley exhibited;

(2) frequent marijuana use generally does not create structural damage on the brain; and (3) McCauley's damage on his brain is from trauma, not because of drug abuse. Dr. Bigler did not connect McCauley's marijuana use with his ability to appreciate the wrongfulness of his conduct at the time of the murder, and the prosecutor's statements sought to highlight this point. *See Moody*, 208 Ariz. at 464. The prosecutor did not commit error.

### b. Statements About Criminal History

**¶35** McCauley argues the prosecutor misstated his criminal history in the penalty phase by (1) telling jurors he was convicted of a domestic violence offense; and (2) cross-examining Dr. Toma on whether McCauley told Dr. Toma that he pled guilty to that offense.

**¶36** Before trial, the State disclosed a police report stemming from a 1991 domestic incident between McCauley and his ex-wife, which indicated that McCauley was arrested but did not reference a conviction ("1991 police report").

**¶37** Defense counsel stated in opening that McCauley "had not been in any type of a situation where he was convicted of anything since he was 18 to 20 years old. So for 40 years, he led a life where all he did was work, all he did was try to provide for his family." The defense also played a video of an interview with his ex-wife's brother, where he said he never saw McCauley "put hands on [his] sister."

**¶38** In the State's opening, the prosecutor told jurors that McCauley's ex-wife disclosed an incident in which he was upset with her, took her to the floor, and banged her head on the ground, causing a concussion. The prosecutor also said, "Well, what about the thing with [ex-wife]? They never mentioned that. One of the things that happened is the police broke in and they arrested him and he was convicted of that." The defense did not object. The prosecutor also mentioned his ex-wife's statement in an interview that he would rape her when she did not want to have sex. The defense did not object.

**¶39** In the direct examination of Dr. Toma, defense counsel admitted the 1991 police report into evidence. Defense counsel asked Dr.

Toma to read from the report, which noted that McCauley's ex-wife told police: (1) McCauley spit in her face, grabbed her by the neck, and threw her into a wall; (2) she fell to the floor, hit her head, and lost consciousness; and (3) when she regained consciousness, she tried to call 911, but McCauley threw her to the floor and called 911 himself. Dr. Toma continued to read from the report that McCauley told police she hit him in the neck and slapped him on the cheek, but he admitted to shoving her and causing her to fall. Defense counsel asked Dr. Toma if any charges were brought against McCauley in connection with the incident. Dr. Toma responded that he did not review any charges.

¶40 Then, on cross-examination, the prosecutor called attention to a different report, Dr. Toma's evaluation of McCauley. The prosecutor asked Dr. Toma about McCauley's response to a question about his legal history, whereby McCauley reported he only had "tickets" before the current charges and his "last ticket was for an overweight ticket for [his] truck." Dr. Toma confirmed these were McCauley's responses. Then the following exchange took place:

> Q: But the question to [McCauley] was whether or not he had any legal problems; right?
> A: Yes.
> Q: And he didn't tell you, for example, about his arrest involving somebody named [ex-wife], did he?
> A: No, not during that interview.
> Q: *He didn't tell you that he pled guilty to that offense, did he?*
> A: *No, he did not.*
> Q: He didn't tell you that the report that you just read from, that he was arrested that night, did he?
> A: No, he did not.

(Emphasis added.) The defense did not object.

¶41 Later, defense counsel asked the court to order the State to disclose documents relating to the 1991 incident, which the court granted. The State disclosed an Arizona Department of Public Safety criminal history document indicating McCauley was convicted of misdemeanor

assault in Glendale City Court for the 1991 incident and sentenced to a 6-month jail term and 12 months of probation ("criminal history report").[2]

¶42       The defense moved for a mistrial due to the State's failure to timely disclose the criminal history report.  In response, the prosecutor told the court he did not know about the criminal history report "until right before the penalty phase," but acknowledged that the State's detective had obtained it in November 2018.[3]  The prosecutor also stated (1) the detective attempted to find other records of the conviction at Glendale City Court, but those records were purged; (2) he intended to call the detective at trial to testify about what he looked into and that he saw a conviction which was later set aside; (3) he marked the criminal history report as an exhibit to refresh the detective's recollection, but did not intend to admit it into evidence; (4) he mentioned a conviction only after the defense discussed McCauley's lack of criminal history; and (5) the State could not disclose the report without a court order because it was labeled: "Unauthorized access, reproduction, or dissemination is prohibited."  The court denied the motion for mistrial but ordered that any evidence of the 1991 conviction was inadmissible.  *See* Part F (addressing McCauley's claim that the court abused its discretion in denying his request for a mistrial due to the disclosure issue).

¶43       As to his claim of prosecutorial error, McCauley contends the prosecutor misstated his criminal history in a statement to the jury and a question to Dr. Toma.  We conclude the prosecutor's statement ("he was convicted of that") argued a fact that was not in evidence because the jury did not receive evidence of any such conviction.  Also, the prosecutor's question to Dr. Toma ("He didn't tell you that he pled guilty to that offense, did he?") asked what McCauley told Dr. Toma, which did not affirmatively misstate the evidence.  Nonetheless, the question insinuated McCauley had pled guilty, and this was not supported by the evidence.

---

[2] The report also indicates his judgment of guilt was later set aside pursuant to A.R.S. § 13-907 (renumbered to A.R.S. § 13-905 in 2019).

[3] McCauley's trial began in October 2019.

¶44 The defense did not object to the prosecutor's statement and question at trial, and thus we review for fundamental error. *See Escalante*, 245 Ariz. at 142 ¶ 21. The jury was instructed that questions to witnesses and attorney remarks, statements, and arguments are not evidence. *See State v. Escalante-Orozco*, 241 Ariz. 254, 280 ¶ 90, 281 ¶¶ 97–98 (2017) (concluding misstatement of evidence was not fundamental error as "comment was brief, and the trial court instructed the jury that the lawyers' closing arguments were not evidence, thereby lessening the impact of the prosecutor's misstatement"), *abrogated on other grounds by Escalante*, 245 Ariz. 135. Also, the comment and question were brief, and the jury never received evidence of the 1991 conviction. *Id.* And McCauley had ample opportunity to correct any misstatement of the evidence. *See Cannon*, 148 Ariz. at 77–78. Indeed, McCauley's counsel specifically addressed his criminal history in closing, stating he only had one conviction for car theft. McCauley has not established fundamental, reversible error.

### c. Statements About Brain Injury Evidence

¶45 In closing, the prosecutor referenced McCauley's brain injury as "a bump on the head that was mild, according to the medical records" and continued referring to it as "a bump on the head." The defense did not object to the "bump on the head" comments.

¶46 McCauley argues the prosecutor misstated the evidence by telling jurors that his brain damage was only a "bump on the head." McCauley points to Dr. Bigler's testimony that McCauley sustained a traumatic brain injury ("TBI") in the 1995 motorcycle accident and "was diagnosed with bilateral injuries to the brain with a specific contusion in the left temporal lobe. He had a significant brain injury." Dr. Bigler further testified that imaging of McCauley's brain in 2015 indicated that his hippocampus and amygdala (structures for memory, cognition, and emotional regulation and control) were reduced in size. But Dr. Bigler also testified that (1) McCauley's Glasgow Coma Scale score was 15 (and a score of 13 to 15 is in the "mild range" of TBIs); (2) McCauley had a "mild" TBI which is "synonymous with concussion"; (3) "[m]ost individuals who [have] a mild [TBI] have a relatively good course of recovery"; and (4) McCauley was able to sufficiently recover to become a truck driver.

**¶47**　　　When characterizing McCauley's brain injury as a "bump on the head," the prosecutor emphasized Dr. Bigler's testimony and McCauley's medical records that indicated he had a Glasgow Coma Scale score of 15. The prosecutor acted within his "wide latitude in closing argument to comment on the evidence and argue all reasonable inferences from it." *Moody*, 208 Ariz. at 464 ¶ 180 (internal quotation omitted).

**¶48**　　　McCauley attempts to equate the prosecutor's conduct here with the conduct in *Hughes*, where the prosecutor had "an overpowering prejudice against psychiatrists and psychologists" because he said psychiatrists should never testify in criminal matters, refused to retain a mental health expert for the State to rebut an insanity defense, and accused the defense expert psychologist of fabricating an insanity defense, among other things. 193 Ariz. at 81–86 ¶¶ 34–61. In reversing the conviction, *Hughes* observed that while the "State has no obligation to retain a mental health expert in a case such as this," it "has an obligation to be honest with the facts." *Id.* at 86 ¶ 61. *Hughes* is inapposite. The prosecutor here did not demonstrate an overpowering prejudice against psychologists and did not accuse Dr. Bigler of fabricating an insanity defense or engaging in unethical conduct. The prosecutor did not misstate the evidence.

### d.　　Statements About Major Depressive Disorder Evidence

**¶49**　　　McCauley argues the prosecutor misstated the evidence relating to his major depressive disorder by (1) stating his depression did not start until 2014 in an effort to sever the link between his depression and the murder (McCauley claims his depression began in 2012); and (2) arguing that any diagnosis was suspect because McCauley was not undergoing treatment. The defense did not object to these statements.

**¶50**　　　As to the first argument, the prosecutor's reference to 2014, in context, related to his argument that McCauley had not received treatment (a prescription or therapy) since he was taken into custody in 2014. His statement did not preclude the possibility that the depression began in 2012.

**¶51**　　　As to the second argument, even with other evidence indicating McCauley's depression was significant, it was reasonable for the

18

prosecutor to highlight McCauley's lack of treatment while incarcerated because it could potentially undermine the severity of the depression. The prosecutor is free to make reasonable inferences from the evidence (i.e., if the depression was as severe as McCauley claims, he would have received some treatment for it). *See Moody*, 208 Ariz. at 464 ¶ 180. The prosecutor did not misstate the evidence.

### 4. Arguments About McCauley's Depression

**¶52** In the penalty phase, McCauley argued that his mental health issues warranted mitigation. McCauley now claims the prosecutor improperly suggested he fabricated his depression, thereby depriving him of his right to have the jury consider and give effect to his mitigation.

**¶53** The jury heard from Dr. DeMarte and Dr. Toma, who both testified that McCauley suffered from depression. Dr. Toma testified that he believed McCauley was delusional, paranoid, and had suicidal thoughts. Dr. DeMarte testified that when she asked McCauley about Dr. Toma's findings, McCauley told Dr. DeMarte "that he laughed off all that, particularly the suicide comment. He said that he told Dr. Toma that Catholics don't kill themselves. He said that he was joking, but he said that he told Dr. Toma that he would never kill himself." Also, the State admitted D.M.'s letters where she mentioned her fear that McCauley might hurt himself, as well as his threats to kill her.

**¶54** In closing, the prosecutor argued McCauley had "fooled" D.M., Dr. Toma, and Dr. DeMarte into thinking that he would harm himself based on what he wrote in his journal. The prosecutor argued McCauley was "good at presenting that he was depressed" and there was "a bit of manipulation associated with it because even the victim of this killing, [D.M.], at one point said, 'I'm afraid that he's going to do harm to himself.'" The defense did not object.

**¶55** It was not improper for the prosecutor to argue that McCauley feigned the extent of his depression. Although there was evidence that McCauley was depressed around the time of the murder, there was also evidence that McCauley (1) "laughed off" the idea that he was delusional, paranoid, and suicidal; (2) was "joking" when he

19

responded on this subject; and (3) specifically denied he would ever kill himself.  The prosecutor argued a reasonable inference from the evidence that McCauley had manipulated others into believing he was severely depressed and suicidal.  *See Moody*, 208 Ariz. at 464 ¶ 180.

**¶56**        The prosecutor also stated without objection: "[Y]ou have to consider that part of [McCauley's] depression may derive from where he's currently residing."  This was also a reasonable inference from the evidence.  The prosecutor's argument that "part of" McCauley's depression "may" derive from his incarceration does not conflict with Dr. DeMarte's testimony that the depression "did not start with Mr. McCauley because of being in jail."  Indeed, Dr. DeMarte testified that "[c]ertainly when someone is incarcerated it could lead to depressive symptoms."  The prosecutor had wide latitude to argue all reasonable inferences from the evidence.  *See id.*  And he was not "especially dishonest," as in *Hughes*, 193 Ariz. at 86 ¶ 61, as he used evidence presented at trial to support the State's theory and did not prohibit the jury from considering McCauley's mental illness mitigation evidence.  The prosecutor did not commit error.

### 5.  Impugning The Integrity Of Defense Counsel

**¶57**        Attacking defense theories is permissible, but "an argument that impugns the integrity or honesty of opposing counsel is improper."  *State v. Acuna Valenzuela*, 245 Ariz. 197, 220 ¶ 93 (2018) (quoting *Hulsey*, 243 Ariz. at 390 ¶ 99).

#### a.  Defense Counsel Wanted Jurors To Blame Victim

**¶58**        The jury was instructed that (1) manslaughter by sudden quarrel or heat of passion requires proof that the defendant acted upon a sudden quarrel or heat of passion resulting from adequate provocation by the person who was killed; (2) adequate provocation means conduct or circumstances sufficient to deprive a reasonable person of self-control; and (3) words alone are not adequate provocation to justify reducing an intentional killing to manslaughter.  *See* A.R.S. §§ 13-1103(A)(2) and -1101(4).

**¶59**      In closing, the prosecutor argued this was not a case of manslaughter because McCauley drove to D.M.'s house in the middle of the night, waited for fifteen minutes, and just three minutes passed from the time D.M. walked to her car and her murder. The prosecutor told jurors they will hear "[i]t was her fault because this was a sudden quarrel or heat of passion, adequate provocation," but "[w]hat could she have done in those three minutes to have done this, to have deserved this?" The prosecutor repeated the "her fault" argument several times. The defense did not object.

**¶60**      McCauley argues the prosecutor improperly implied that defense counsel wanted the jury to blame the victim for her death. But the prosecutor's statements addressed McCauley's defense theory, not the integrity or honesty of defense counsel. Specifically, the prosecutor sought to inform jurors that to find McCauley acted upon a sudden quarrel or heat of passion, they would essentially need to find that D.M.'s actions contributed to her death. "Because these statements focus on the defendant's approach, rather than on defense counsel personally," they did not improperly impugn the integrity or honesty of defense counsel. *See Acuna Valenzuela*, 245 Ariz. at 220 ¶ 98.

### b. Accusing Defense Counsel Of Coaching Witnesses

**¶61**      McCauley alleges the prosecutor improperly accused defense counsel of coaching mitigation witnesses.[4]

---

[4]    Intermittently in his briefing, McCauley cites federal and state constitutional provisions but does not develop arguments under those provisions or address how the Arizona Constitution affords greater protection in the relevant context. This is one such instance. McCauley does not argue how article 2, sections 4 and 24 provide him greater constitutional protection in the context of the prosecutor's statements here. "Merely referring to the Arizona Constitution without developing an argument is insufficient to preserve a claim that it offers greater protection than" the United States Constitution. *State v. Jean*, 243 Ariz. 331, 342 ¶ 39

21

**¶62**        In its opening statement, the defense played a video of witnesses who were interviewed about McCauley.  At one point, a witness answered a question and the interviewer said, "so I probably ought to do that one more time since we were laughing through some of it but that's fine, its good."  Later, the prosecutor showed that portion of the video to the defense investigator, Van DiCarlo (a retired police chief), and asked questions about whether "it's appropriate during an investigation . . . to tell a witness how to answer questions such as, 'Don't smile.'"  DiCarlo responded that "generally speaking, it is not acceptable," but he could not be absolute.  As to what the interviewer said in the video, he would not say it was appropriate or that he would encourage it.  The defense objected during this line of questioning, and the court overruled the objections.

**¶63**        In the State's closing argument, the prosecutor stated without objection that (1) two of the interviewees were interviewed by the same person, on the same day, and in the same place; (2) "[w]e just don't know if . . . one person heard what the other person said"; and (3) the interviewer's technique suggested "there was a little bit of rehearsing that was going on."

**¶64**        The prosecutor's questions and statements did not improperly impugn defense counsel's integrity or accuse defense counsel of coaching mitigation witnesses.  They fairly questioned (1) whether the method of questioning was a best practice; and (2) the possibility that two witnesses could hear each other's answers.  Taken in context, the questions and statements relate to witness credibility based on the method and technique of conducting the interviews, rather than defense counsel's integrity.  *See Acuna Valenzuela*, 245 Ariz. at 220 ¶¶ 95–96.  The prosecutor even stated the technique was used by an "investigator, somebody not in this court" and "[n]o one is saying that there's anything wrong with that technique."  This is unlike *State v. Cornell*, where the prosecutor asked questions insinuating "that advisory counsel coached Defendant on how to

_____

(2018); *see also State v. Thompson*, 252 Ariz. 279, 290 ¶ 27 (2022) (finding argument waived where defendant generally recited the law but failed to develop the argument).

feign [a] symptom of temporal lobe epilepsy." 179 Ariz. 314, 330–31 (1994). The questions and statements do not amount to prosecutorial error.

### c. Accusing Defense Counsel Of Believing Jurors Are Bullies

¶65 In the penalty phase closing arguments, defense counsel told the jury they "assume that it will not" happen, but "you have the right not to be bullied or shamed or insulted based on your view . . . . If any of you see anybody bullying anybody else, you report that to the judge." Later, the prosecutor stated, "[n]owhere in these jury instructions does it talk about anybody being bullied. Perhaps that's what the defense thinks that you are, that some of you are bullies, don't you know? Just by looking at you, they know that some of you are those kind of people that'll push people around." The defense did not object.

¶66 McCauley argues the prosecutor improperly told jurors that defense counsel thinks they are bullies. We agree. Defense counsel merely informed jurors they had the right not to be intimidated based on their individual views, and did not call them bullies. The prosecutor's statement—that defense counsel thinks some of the jurors are bullies who will push people around—improperly impugned the integrity of defense counsel. *See Acuna Valenzuela*, 245 Ariz. at 220 ¶ 93.

¶67 The State argues a prosecutor may "right the scale" when defense counsel engages in misconduct, but that principle is inapplicable here. *See United States v. Young*, 470 U.S. 1, 12–13 (1985) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."). The prosecutor's statement was not "invited" or necessary to "right the scale," as defense counsel did not engage in misconduct by telling jurors they had a right not to be bullied. The statement was prosecutorial error.

¶68 Because the defense did not object, we review for fundamental error. Here, the prosecutor's improper statement was brief within the context of the entirety of the State's closing argument. And the court instructed the jury, both verbally and in writing, that what the

lawyers say in closing argument is not evidence. *See State v. Sanders*, 245 Ariz. 113, 133 ¶¶ 98–99 (2018) (holding statement that impugned the integrity of defense counsel was not fundamental error because "there is no reasonable likelihood that this isolated statement affected the jury's verdict" and "any prejudice was cured by the court instructing the jury that what the lawyers say in closing arguments is not evidence"). There is no reasonable likelihood these brief statements affected the jury's verdict given the quality and quantity of evidence presented. There is no fundamental, reversible error.

### 6. Impugning The Integrity Of Defense Expert Dr. Toma

**¶69** McCauley argues the prosecutor improperly impugned the integrity of Dr. Toma. "It is proper impeachment to inquire into the credentials and employment of an expert witness to show bias or motive. However, a prosecutor may not insinuate that an expert is unethical or incompetent without properly admitted evidence to support it." *State v. Bailey*, 132 Ariz. 472, 478–79 (1982).

#### a. Accusing Dr. Toma Of Destroying Notes

**¶70** Dr. Toma testified that he gave the prosecutor a copy of his notes from his clinical interview of McCauley. The prosecutor asked Dr. Toma questions about whether he remembered stating he destroys his notes. Dr. Toma clarified that there are different types of notes, he destroys the notes he takes during phone calls with counsel, and he has a copy of his clinical interview notes. Later, the prosecutor asked Dr. DeMarte about her note preservation practice. She responded that she keeps "everything related to all of these cases." Dr. DeMarte also testified that she received and reviewed Dr. Toma's clinical interview notes. The defense did not object to the prosecutor's questions.

**¶71** McCauley claims the prosecutor baselessly accused Dr. Toma of destroying clinical interview notes. But the prosecutor's questions reflected a need for clarification about (1) how Dr. Toma handles different categories of notes; and (2) Dr. Toma's statements in a previous interview about how he destroys certain notes. After it was clarified that Dr. Toma preserves clinical interview notes but destroys notes from phone calls with

counsel, the prosecutor did not press further and did not argue in closing that Dr. Toma destroys clinical interview notes.[5]  The prosecutor did not improperly impugn Dr. Toma's integrity.

### b.  Accusing Dr. Toma Of Confirmation Bias

**¶72**        Dr. Toma testified about McCauley's mental disorder, which he diagnosed as "a major depressive disorder with psychotic features." According to Dr. Toma, this disorder stemmed from McCauley's previous TBI and was supported by his "delusional statements" in a clinical interview.

**¶73**        The State's theory was that Dr. Toma misdiagnosed McCauley as "delusional" in the clinical interview, and he interpreted subsequent tests in a manner that confirmed such diagnosis.  The prosecutor asked Dr. Toma whether his diagnosis was influenced by confirmation bias due to Dr. Toma (1) believing McCauley was delusional in the clinical interview before reviewing test results; and (2) citing a document ("Cole, Bustamante, Pinnell, & Toma, 2015"), a student dissertation Dr. Toma had reviewed and approved as a member of a committee.  On both fronts, Dr. Toma denied having any confirmation bias.

**¶74**        The prosecutor asked Dr. Bigler about whether it is appropriate to rely upon and cite an article written by a student, which was part of an assignment and not peer reviewed.  The defense objected, and the court sustained the objection.  The prosecutor then asked, without objection, whether Dr. Bigler knew that Dr. Toma had cited in his report a student article that "wasn't peer reviewed."  Dr. Bigler did not know.  In closing, the prosecutor argued Dr. Toma had confirmation bias that caused him to read McCauley's tests the way he did.

---

[5]  A juror question to Dr. DeMarte about the circumstances under which destroying notes would be normal practice in her field does not support McCauley's claim.  This is a relevant question considering that Dr. Toma admitted he destroys notes he takes during phone calls with counsel.

¶75 McCauley claims the prosecutor improperly impugned Dr. Toma's integrity. We disagree. The prosecutor did not accuse Dr. Toma of unethical conduct but instead attempted to impeach Dr. Toma's report and testimony with evidence in the record. Indeed, (1) Dr. Toma believed in the clinical interview that McCauley was delusional (before reviewing any materials about McCauley), and he reviewed test results after that interview; (2) Dr. DeMarte concluded McCauley did not have delusions or psychosis; and (3) in his report, Dr. Toma cited a student dissertation that Dr. Toma had reviewed and approved as a committee member (which was not otherwise peer-reviewed or published in any academic journal). The prosecutor did not improperly impugn Dr. Toma's integrity.

### 7. Misstatements About (F)(6) Aggravator In The Penalty Phase

¶76 McCauley claims the prosecutor made two misstatements about the (F)(6) aggravator in penalty phase closing argument: (1) "In light of the aggravating circumstances you have found, you must then individually determine if the total of the mitigation is sufficiently substantial to call for leniency"; and (2) "To do this, you must consider the quality and strength of the aggravating factor, which there's no doubt about that this was cruel or depraved, and mitigating factors." The defense did not object.

¶77 We agree the references to "aggravating circumstances" and "cruel" were misstatements because the jury found one aggravating circumstance and rejected "especially cruel." *See State v. Lynch* ("*Lynch I*"), 225 Ariz. 27, 42 ¶ 84 (2010) (explaining "the (F)(6) aggravator is a single aggravating circumstance that can be established in alternative ways").

¶78 Because the defense did not object, we review for fundamental error. "[E]valuating prejudice and its amenability to cure requires a court to examine the entire record—including jury instructions—*in context* with counsel's arguments." *Murray*, 250 Ariz. at 553 ¶ 37. When the prosecutor made these misstatements, he also told jurors to "consider the quality and the strength of the aggravating factor" and did not otherwise argue that the especially cruel aggravator was still at issue. Also, the jury was aware of its unanimous decision on aggravation and rejection of "especially cruel." The prosecutor's misstatements were

brief, comprising just two lines in the trial transcript, and the prosecutor did not emphasize the misstatements in urging the death penalty. In context with the entire closing argument, these brief misstatements do not constitute fundamental, reversible error.[6]

**¶79**　　　　McCauley also claims the prosecutor compounded the misstatements by telling the jury, "[y]ou need to consider what she went through at the time." But as this Court explained in *State v. Leteve*, "[i]rrespective of the mitigation evidence presented by the defendant, the state may present evidence of the circumstances of the crime. Thus, the state may 'rebut' mitigation—that is, a conclusion that the defendant should be shown leniency—by introducing evidence of the 'specific harm caused by the defendant.'" 237 Ariz. 516, 528–29 ¶ 47 (2015) (internal citations omitted) (quoting *State v. Forde*, 233 Ariz. 543, 572 ¶ 126 (2014)). The specific harm caused by McCauley was relevant. The prosecutor's statement was not error.[7]

### 8. Cumulative Effect Of Prosecutorial Error

**¶80**　　　　McCauley argues that, even if the separate instances of error above are not individually reversible error, the cumulative effect of the error was a denial of due process.

---

[6] This case is unlike *Lynch I*, where the written jury instructions incorrectly stated that three separate aggravating circumstances were found to exist ((1) especially cruel; (2) especially heinous; and (3) especially depraved), in addition to the "expectation of the receipt of anything of pecuniary value" aggravator. 225 Ariz. 27, 42 ¶¶ 82–84. The jury in *Lynch I* was instructed that "there were four aggravating factors rather than two, and the prosecution emphasized this incorrect instruction in urging the death penalty"; thus, a new penalty phase was warranted. *Id.* at 42–43 ¶¶ 82–88.
[7] When discussing the instructions with jurors, the judge once referred to "aggravating and mitigating *circumstances*" and once said the "severity of the aggravating factor -- *factors* and the quality of the value of the mitigating factor." (Emphasis added.) The defense did not object. These brief, ambiguous references do not constitute fundamental, reversible error.

**¶81**        As discussed, McCauley has alleged several instances of individual prosecutorial error at trial.  But we find prosecutorial error only where the prosecutor: (1) misstated the evidence in one question to Dr. Toma and one statement to the jury; (2) indicated that defense counsel believes jurors are "bullies"; and (3) misstated the aggravator in using the terms "aggravating circumstances" and "cruel," each one time.  At trial, McCauley did not object, either individually or cumulatively, to these instances of prosecutorial error.   We therefore review McCauley's cumulative prosecutorial error claim for fundamental error.  *Rushing*, 573 P.3d at 89–90 ¶ 57.

**¶82**        This Court examines "whether the cumulative effect of individual allegations 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Payne*, 233 Ariz. at 511 ¶ 106 (quoting *Hughes*, 193 Ariz. at 79 ¶ 26).  "Cumulative error warrants reversal only if [error] was 'so pronounced and persistent that it permeated the entire atmosphere of the trial.'"  *Id.* at 515 ¶ 134 (quoting *Hughes*, 193 Ariz. at 79 ¶ 26) (citation modified).

**¶83**        In the cumulative error analysis, McCauley adds new allegations of prosecutorial error.  He claims the prosecutor misrepresented his employment discipline record in one question to a defense mitigation witness, where the witness did not answer and the judge immediately sustained defense counsel's objection.  Next, he points to the following: (1) in voir dire, a later-empaneled juror said she was abused 50 years ago, has since been married to a different man for almost 43 years, and "I survived," to which the prosecutor responded, "[h]andsomely it appears" (the defense did not object); and (2) the prosecutor emphasized victim impact statements in closing argument of the penalty phase (the defense did not object).  McCauley has not demonstrated these instances amount to prosecutorial error that could have affected the jury's verdict, thereby denying McCauley a fair trial. *See Murray*, 250 Ariz. at 548 ¶ 13; *see also State v. Roque*, 213 Ariz. 193, 225 ¶ 132 (2006) ("Because the jury may consider

victims' statements in making its sentencing decision, the prosecutor may discuss them in his closing argument.").[8]

**¶84** We conclude that the cumulative effect of all the individual prosecutorial errors we found did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. *See Payne*, 233 Ariz. at 511 ¶ 106. There was not cumulative error that permeated the entire atmosphere of the trial and infected it with unfairness. Thus, reversal is not warranted. *See id.* at 515 ¶ 134 (explaining cumulative error warrants reversal only if error was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial" (quoting *Hughes*, 193 Ariz. at 79 ¶ 26)).

## B. Right To An Impartial And Constitutionally Adequate Jury

**¶85** McCauley argues the trial court violated his constitutional right to an impartial jury by precluding him from asking certain questions in voir dire.[9] *See, e.g.*, *Morgan v. Illinois*, 504 U.S. 719, 728 (1992) ("[T]he Sixth *and* Fourteenth Amendments . . . ensure the impartiality of any jury that will undertake capital sentencing.").

**¶86** "We review the court's objected-to rulings concerning voir dire for an abuse of discretion," and "review unobjected-to rulings for fundamental error." *State v. Thompson*, 252 Ariz. 279, 293 ¶ 45–46 (2022). "But whether a question to jurors is allowable under Arizona law is reviewed de novo." *Id.* ¶ 45. Also, constitutional issues and purely legal issues are reviewed de novo. *State v. Hidalgo*, 241 Ariz. 543, 548 ¶ 7 (2017).

**¶87** To prevail on a claim of a constitutionally inadequate jury, a defendant must demonstrate "the voir dire examination was inadequate"

---

[8] McCauley also points to the prosecutor referring to "issues that were designated" when discussing jury instructions about possible mitigating circumstances. For the same reasons discussed in Part H, the reference to "designated" was not fundamental, reversible error.

[9] McCauley made the requests at issue after the parties had finalized the jury questionnaire.

and "as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial." *Moody*, 208 Ariz. at 451 ¶ 95; *see also State v. Tison*, 129 Ariz. 546, 551 (1981) ("We will not disturb the trial court's selection of the jury in the absence of a showing that a jury of fair and impartial jurors was not chosen.").

### 1. Juror Questionnaire In Voir Dire

**¶88**　　　For voir dire, counsel for both parties submitted proposed juror questionnaires and appeared in court to finalize the questionnaire. The final questionnaire stated: "The State alleges that on or about November 23, 2014, Edward Littleton McCauley shot and killed his estranged wife in Glendale, Arizona." The questionnaire also included a section "ATTITUDE ABOUT THE DEATH PENALTY," which explained, "If the defendant is found guilty of first degree murder, the jury will be asked to decide whether the defendant will be sentenced to life imprisonment or receive the death penalty." It then asked questions that sought to expose bias for or against the death penalty: (1) "Do you hold the opinion that if a person kills another, he should always be sentenced to death?"; (2) "[W]ill you, for whatever reason, automatically vote for the death penalty without considering the evidence and the instructions of law that will be presented to you?"; and (3) "Which most accurately states your opinion regarding the death penalty?" with several proposed answers, one of which was: "I would vote to impose the death penalty in every case."

**¶89**　　　Later, the defense moved to notify jurors that McCauley was charged with *premeditated* first degree murder, in order to ask whether their answers would change after receiving that information. The court denied the motion, concluding the current questionnaire that both parties had worked on properly satisfied the voir dire requirement.

**¶90**　　　McCauley claims the court violated his constitutional right to a fair trial by an impartial jury, as addressed in *Morgan*, when it refused to inform prospective jurors of the premeditation element of the offense. Under *Morgan*, a juror who would automatically vote for or against capital punishment, "regardless of his or her instructions, is not an impartial juror and must be removed for cause." 504 U.S. at 728. Thus, a court may not

"refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction." *Id.* at 721, 735.

**¶91** *Morgan* stands for the proposition that "defendants are entitled to discover through voir dire 'whether a potential juror will automatically impose the death penalty once guilt is found.'" *State v. Parker*, 231 Ariz. 391, 399 ¶ 21 (2013) (quoting *State v. Jones*, 197 Ariz. 290, 303 ¶ 27 (2000)). It "does not, however, require a trial court to permit open-ended questions about jurors' general views on the death penalty and mitigation, or whether jurors would impose the death penalty if they found specific aggravators." *Id.* at 399–400 ¶ 21. This Court has "repeatedly rejected invitations to expand *Morgan*'s holding." *Id.* at 400 ¶ 21.

**¶92** McCauley was allowed oral questioning and had access to a 34-page questionnaire, with questions about the death penalty completed by prospective jurors. *See State v. Garza*, 216 Ariz. 56, 64 ¶ 25 (2007). Prospective jurors were told McCauley was charged with first degree murder. McCauley's request to inform jurors that one element of that charge is premeditation is outside the scope of *Morgan*. *See State v. Glassel*, 211 Ariz. 33, 46 ¶ 40 (2005) (concluding proposed questions "did not further the *Morgan* inquiry because [they] did not address the issue of whether a juror would automatically impose the death sentence regardless of the jury instructions or mitigation evidence"). Also, "[i]t is not a legitimate function of voir dire to condition the jury to the receipt of certain evidence or to a particular view of the evidence." *State v. McMurtrey*, 136 Ariz. 93, 99 (1983).

**¶93** Moreover, after explaining his reasoning for not allowing the premeditation question in general, the judge reiterated a point he previously made: "So again, if you are concerned about any follow-up that you might have, please ask to approach and I will consider your request at the time of the specific question or to a specific juror."[10] But the defense did not later raise specific juror questionnaire responses and request permission

---

[10] We disagree with McCauley that "the trial court expressly denied such a process." The trial court left open the possibility for such a process to play out and the court would rule on a situation-by-situation basis.

to voir dire those particular individuals on premeditation. As in *State v. Riley*, the "judge's invitation to counsel to ask follow-up questions mitigates any deficiency in the court's questioning." 248 Ariz. 154, 173 ¶ 44 (2020) (quoting *Moody*, 208 Ariz. at 452 ¶ 98). The court did not err.[11]

**¶94** McCauley also argues the voir dire resulted in the seating of a biased jury and structural error, because had certain empaneled jurors known the charge was premeditated murder, they likely would have answered the *Morgan* inquiry differently. McCauley points to several juror questionnaire responses, indicating they believed the death penalty may be warranted in certain cases and it would depend on the facts and crime in each case. But their responses do not indicate they would automatically impose a death sentence regardless of the jury instructions or mitigation evidence presented.

**¶95** McCauley also points to Juror 3's question asked on the second day of trial: "On Day 1, Defense kept saying Eddie shot the wife[.] [H]as Eddie pled guilty to shooting his wife?" This question does not demonstrate a lack of impartiality about the death penalty. But even so, Juror 3 was struck for cause on the second day of trial. The court's refusal to inform prospective jurors about premeditation was not structural error.

## 2. Juror Questions About McCauley's Texts And Images

**¶96** McCauley asked the trial court to (1) notify prospective jurors about his texts and images; and (2) ask case-specific questions about their ability to still consider mitigation evidence in light of those texts and images. The court denied the request.

---

[11] This conclusion does not contradict *State v. Garcia*, 224 Ariz. 1, 9 ¶ 16 (2010), finding the trial court "did not abuse its discretion in allowing the State to ask prospective jurors if they could consider imposing a death sentence if a defendant had not actually shot the victim." The lack of abuse of discretion in *Garcia* does not mean McCauley's premeditation question was constitutionally mandated here.

**¶97** "[D]ue process requires that trial courts permit a defendant to inquire whether prospective jurors would always impose the death penalty." *Johnson*, 247 Ariz. at 196 ¶ 102. But voir dire is "not meant to allow a defendant to 'ask a juror to speculate or precommit on how that juror might vote based on any particular facts.'" *State v. Smith*, 215 Ariz. 221, 231 ¶ 42 (2007) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998)). "Nor must a trial court allow a defendant to ask questions 'designed to condition the jurors to damaging evidence expected to be presented at trial and to commit them to certain positions prior to receiving the evidence.'" *State v. Bush*, 244 Ariz. 575, 585 ¶ 36 (2018) (quoting *State v. Melendez*, 121 Ariz. 1, 3 (1978)).

**¶98** McCauley did not identify to the trial court specific questions he was proposing to ask about the texts and images. Instead, he broadly requested to inform jurors of and ask case-specific questions about the texts and images. His proposal appeared designed to condition jurors by forewarning them of damaging evidence expected to be presented at trial and asking them to speculate on or commit to how they would assess mitigation in light of those texts and images. *See Bush*, 244 Ariz. at 585 ¶ 36; *Lynch I*, 225 Ariz. at 36 ¶ 37; *State v. Schad*, 129 Ariz. 557, 567–68 (1981); *Melendez*, 121 Ariz. at 3. Such proposed disclosure and questioning stretches beyond an inquiry into "whether a potential juror will automatically impose the death penalty once guilt is found." *Parker*, 231 Ariz. at 399 ¶ 21 (quoting *Jones*, 197 Ariz. at 303 ¶ 27).

**¶99** The cases cited by McCauley do not support error here. In *Lynch I*, 225 Ariz. at 36 ¶ 37, this Court explained that *State v. Johnson*, 212 Ariz. 425 (2006), "does not prohibit telling jurors about the particular facts of the case during voir dire. Rather, *Johnson* only held that the trial court may refuse to permit parties to ask jurors to speculate on or commit to how they would assess specific mitigation." Thus, *Lynch I* recognized there are instances in voir dire when disclosure of and questioning about case-specific facts is improper.

**¶100** In *Bush*, the defendant claimed the court violated his rights to a fair trial and due process by denying his request to present prospective jurors with graphic photographs and a 911 call recording. 244 Ariz. at 585–86 ¶¶ 34–37. This Court rejected the claim, noting he was allowed

to describe "'gruesome photographs' and other 'gut-wrenching' evidence" and question whether such evidence would prevent prospective jurors from being fair and impartial; "exposing them to the 911 tape and photographs would have unnecessarily risked conditioning the jurors to the State's damaging evidence." *Id.* at 585 ¶ 37. *Bush*, however, did not mandate that all "gruesome" or "gut-wrenching" evidence be disclosed to prospective jurors. *Id.* Instead, it reiterated that courts should prevent questions designed to condition jurors to damaging evidence expected at trial and commit them to certain positions before receiving such evidence. *Id.* ¶¶ 36–37.

¶101 Finally, *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), *overruled on other grounds by Atkins v. Virigina*, 536 U.S. 304 (2002), held that a death sentence was unconstitutional because the jury instructions did not "inform[] the jury that it could consider and give effect to the mitigating evidence of [defendant's] mental retardation and abused background by declining to impose the death penalty." But *Penry* did not require that a court allow case-specific questions in voir dire. 492 U.S. 302.

¶102 Here, McCauley does not sufficiently articulate why the broad disclosures and questioning he requested before trial were not an improper "attempt to 'condition' the jurors by forewarning them of unfavorable facts concerning defendant." *Schad*, 129 Ariz. at 567–68. McCauley had the requisite "adequate *voir dire* to identify unqualified jurors," *Morgan*, 504 U.S. at 729, and the trial court did not err in denying McCauley's request. *See McVeigh*, 153 F.3d at 1207 ("Numerous courts have held *Morgan-type* questions objectionable when the question was predicated on facts specific to the case at issue . . . .").

¶103 McCauley also argues the court's denial was structural error because it resulted in the empaneling of biased factfinders—specifically Jurors 3 and 6 who "had visceral reactions to the text messages during the opening statement." McCauley points to Juror 6's comment to counsel and the judge on the second day of trial that "[a] lot of people said, '[y]es, we're upset'" after seeing the texts and images in the State's opening statement. Notably, however, Jurors 3 and 6 were excused on the second day of the guilt phase trial. But even if some jurors initially found the texts and images disturbing, after the release of Jurors 3 and 6, the court individually

questioned all remaining jurors about whether they found anything presented so offensive that they could not be fair and impartial. All responded they could be fair and impartial. The trial court even noted its belief that jurors were very honest about being able to be fair and impartial. *See State v. Chaney*, 141 Ariz. 295, 303 (1984) (stating the trial court observes a juror's demeanor and tenor of answers and "is in a position to determine first hand whether a juror can render a fair and impartial verdict"). Structural error did not occur here.

### 3. "What Does Mitigation Mean To You?"

¶104 McCauley sought to ask in voir dire, "What does mitigation mean to you?" McCauley claims the trial court erred in denying the request, citing *State v. Patterson*, 230 Ariz. 270 (2012).

¶105 In *Patterson*, this Court determined that defendant was properly restricted from asking a potential juror "what kind of circumstances she would find mitigating" because defendants "are not entitled to 'ask potential jurors what types of evidence they will consider to be mitigating.'" 230 Ariz. at 273 ¶¶ 7–8 (quoting *Glassel*, 211 Ariz. at 47 ¶ 44). This restriction did not prevent the defendant "from sufficiently investigating the beliefs of potential jurors," as the trial court "allowed [him] to probe jurors 'on their basic beliefs, views, biases and prejudices concerning the death penalty, as well as their general views concerning aggravating and mitigating circumstances that must be considered in determining whether to impose a sentence of life or death.'" *Id.* at 273–74 ¶ 9. *Patterson* noted that, "[a]s the trial court suggested, a defendant may legitimately ask what mitigation means to that juror." *Id.* But *Patterson* did not hold there is a constitutional right to ask the specific question, "What does mitigation mean to you?" Indeed, *Johnson* later characterized the question "What would mitigation mean to you?" as a "case-specific question[] our case law generally prohibits." 247 Ariz. at 196 ¶¶ 102–03 (explaining a defendant is not permitted to ask jurors to speculate or precommit on how they might vote based on particular facts or ask what types of evidence they will consider mitigating). Thus, the question is generally not allowed.

¶106 In this case, the juror questionnaire included Question 111(a):

> The law requires that the jury must consider any aspect of the defendant's character, background, propensities or record and any of the circumstances of the offense as mitigation evidence before deciding if the defendant should be sentenced to death or to life in prison. Mitigation evidence may include, but is not limited to, whether the defendant has mental health issues, a criminal record, or a lack of a criminal record, substance abuse issues, family dysfunction, lack of education, defendant's age, and/or family or environmental upbringing. Are you willing to listen to, and consider, this type of evidence: Yes or no? If no, please explain.

This question ensured potential jurors would understand, review, and consider mitigation evidence. Also, the court allowed the defense to ask prospective jurors, "Can you imagine a situation where the totality of the defendant's character, including things he's endured or accomplished, could warrant mercy despite his crimes?" Moreover, the juror questionnaire asked about potential predispositions on capital punishment, and the defense could request permission to ask reasonable follow-up questions. This approach was reasonably aimed at obtaining information more relevant to whether a juror can be fair and impartial than asking about a juror's personal definition of mitigation. McCauley's requested question was not necessary to ensure he had an adequate voir dire.[12] *See Glassel*, 211 Ariz. at 46 ¶ 38 (finding voir dire constitutionally adequate where two questions in the questionnaire "specifically addressed the *Morgan* issue"

---

[12] Defense counsel asked one prospective juror, "Are there other factors besides whether or not someone is able to be rehabilitated that you could still see yourself imposing the death penalty for?" This was an improper stakeout question, and the State's objection was properly sustained. *State v. Prince*, 226 Ariz. 516, 529 ¶ 35 (2011) (explaining stakeout questions ask jurors to speculate or precommit about how they might vote based on particular facts). Defense counsel restated the question and received an answer. No error occurred here.

and the court conducted individual voir dire of jurors with certain responses).

¶107    McCauley further claims the limitation here was structural error that led to the empaneling of a constitutionally inadequate jury, pointing to (1) responses in voir dire indicating some prospective jurors did not understand the term mitigation; and (2) Juror 3's question, "On Day 1, Defense kept saying Eddie shot the wife[.]  [H]as Eddie pled guilty to shooting his wife?"  But Juror 3—who was removed on the second day of trial—appeared confused about the guilt phase proceeding, not mitigation. And McCauley had an adequate opportunity to examine prospective jurors. Also, the jury received detailed instructions at trial about the definition of mitigation and what mitigation evidence may be considered.  Structural error did not occur here.[13]

## C.  Improperly Denied Mistrial For Juror Misconduct

¶108    McCauley argues the trial court violated his constitutional rights by failing to meaningfully investigate juror misconduct and not declaring a mistrial for such misconduct.

¶109    We review for an abuse of discretion a trial court's decision to grant or deny a new trial based on alleged jury misconduct, *State v. Hall*, 204 Ariz. 442, 447 ¶ 16 (2003), and a decision whether to conduct an evidentiary hearing based on alleged misconduct, *Acuna Valenzuela*, 245 Ariz. at 214 ¶ 52.  "[J]uror misconduct warrants a new trial if the defense shows actual prejudice or if prejudice may be fairly presumed from the facts."  *State v. Miller*, 178 Ariz. 555, 558 (1994) (emphasis removed).

---

[13]  For all the same reasons discussed in Part B, the court did not violate Arizona Rule of Criminal Procedure 18.5, which addresses the procedure for jury selection.  *See, e.g.*, Ariz. R. Crim. P. 18.5(f) (allowing parties sufficient time to conduct further oral examination with "reasonable limitations").

## 1. Background

**¶110**         At the beginning of trial, jurors were admonished to: (1) only consider evidence properly admitted; (2) not discuss the case until final deliberation; and (3) advise the judge in writing immediately if a juror believed another juror had violated any provision of the admonition.

**¶111**         In the State's opening, jurors were shown McCauley's texts and images. The next day, a juror submitted the following question:

> Your Honor – In regards to the pornography that was displayed last Thursday – I found this very disturbing and traumatizing the way this was handled. This information could have been verbally communicated and if it's necessary to show a photo of pornography or extreme violence, we could be given a warning and the opportunity to turn away. Our Bill of Rights states that we should be treated with respect. The prosecutor was extremely rude in the delivery of opening statement. Is there anything that you can do?

The parties agreed all jurors should be questioned as to whether they found anything in opening so disturbing or traumatizing that they could not remain fair and impartial or objectively consider the evidence. Jurors were brought in one-by-one and questioned by the court, and the prosecution and defense were allowed to ask follow-up questions.

**¶112**         Jurors 1, 2, 4, and 5 stated they were not affected by anything presented and could remain fair and impartial and consider all evidence.

**¶113**         Juror 3 stated, "I understand that it has to be shown, but the pictures the very first day were a little disturbing. So with that being said, I think I can still be fair and impartial, but pretty disturbing."

**¶114**         Juror 6 identified herself as the juror who submitted the question. She was "shocked to see pornography put in front of [her] face," it was "highly offensive," and she "was shocked at how many men said, 'Do you believe that attorney just threw those pictures down there like that? That's shocking.'" She indicated this was "at least four" male jurors. Juror

6 said she asked other jurors how they felt after the prosecutor's opening statement and told them she "was still very upset by it and didn't understand why it had to be that way," but was hopeful it could be done differently next time. According to Juror 6, "[a] lot of people said, '[y]es, we're upset, but . . . we don't want to say anything.'" She indicated this was "[p]robably six" jurors, but they were not as upset as she was and "it was just one comment of 'I can't believe that he did that, just put those pictures up there like that.'" When asked about the length of the conversation, she responded, "[t]hree sentences' worth" and denied further conversations.

¶115     Juror 6 said she "looked up what rights we have as jurors" the night before, but nobody else participated in that research. When she told other jurors she looked up their rights and intended to write a question, none of them wanted to participate in the conversation, so she dropped it. Pursuant to the parties' stipulation, the court struck Juror 6 for cause.

¶116     The court then brought in all jurors for questioning:

- Juror 1 overheard Juror 6 express she was upset about the State's opening statement. Juror 1 responded, "[w]e're not supposed to talk about it" and did not hear other discussions on the topic.

- Juror 2 overheard a juror say "what was shown was graphic pornography and that they were just looking to be more prepared," and then overheard "maybe one or two [jurors] that were . . . agreeing." Juror 2 did not engage in the discussion and did not hear other discussions on this topic.

- Juror 3 overheard a juror say she "researched the juror's rights" and was going to submit a question "voicing [her] thoughts and concerns" about the photographs and asked if others wanted to be a part of it. Juror 3 indicated "some people, . . . from what I'm gathering, . . . were, you know, really taken," but then they were called in and never actually had a chance to discuss the matter. Juror 3 said, "everybody's been very good about not talking about anything."

- Juror 4 said a juror "spoke of the evidence that the prosecution showed in the beginning. She found it offensive," and then another said "she's not supposed to be discussing the case." Juror 4 also overheard the juror indicate she was going to write a "letter" and asked if others wanted to participate, but "[n]o one responded." Juror 4 saw her writing but it was never read out loud to the group.

- Juror 5 overheard a juror indicate being "offended" and she was going to write a note, but she did not talk about the case. Another juror responded, "[i]f you feel that way, then you should write a note." Juror 5 did not hear other discussions on the topic or read the note.

- Juror 8 overheard a juror say "[i]mages . . . shared on the first day were disturbing," and the juror was going to write a note and wanted to know if others wanted to write a note too. Juror 8 heard another juror respond, "We should not be talking about this," and that was the end of the matter.

- Juror 9 overheard a juror "mention that she was offended by the images in the opening statements" and she believed there was a "breach" of their "rights as jurors." But nobody responded, and Juror 9 "just ignored it and moved on."

- Juror 10 overheard a juror say "she would have liked a warning before pictures were shown," but did not hear any response.

- Juror 11 overheard Juror 6 say the pictures were "offensive" and another juror responded, "You can't talk about it." Juror 11 did not hear anyone else discuss the case.

- Juror 12 overheard Juror 6 say "it just wasn't appropriate for them to . . . open up like that," but nobody responded. Juror 12 then heard Juror 6 say "she was going to bring it up to" the judge and saw her "writing from across the table," but did not read it or see anyone else read it.

- Juror 13 overheard a juror say she did not like how something was brought forward and asked if anybody would sign a note with her. Juror 13 responded, "what you see here might be disturbing" and "there was no reason why they would have to bring a disclaimer. [I thought] we already had a disclaimer or something like that on this trial." According to Juror 13, others indicated "yes, it was disturbing," but it was necessary. Juror 13 did not otherwise hear a response on the topic.

- Juror 14 overheard a juror say she was "disturbed" and "very unhappy" with "what was presented" and was going to write a note to the judge. Juror 14 did not respond but indicated "there was something said about just that's how it's going to have to be and just the nature of the . . . case," and nobody said they wanted to join the note.

- Juror 15 overheard a juror comment that there was not "a warning or a disclaimer," but there was no response after that. When that juror said she was going to address the opening statement with the court, nobody responded.

- Juror 16 overheard a juror mention "certain rights that the jurors had," but nobody responded.

- Juror 17 overheard a juror say "she found the pictures to be offensive and didn't think that it was appropriate for that to be shown," and Juror 17 responded, "There's evidence that's going to be shown that . . . you might not want to see in your everyday life, but it's probably pertinent to the trial."

¶117 In questioning, Jurors 9, 15, and 16 also disclosed that they saw a juror with a printout in the jury room that morning. Juror 9 described seeing on the table a "printout" of "some online article" that "looked like two pages," but did not recall exactly what it said and did not read it, see anyone read it, or hear anyone discuss it. Juror 15 saw a juror with "a printout about something" that "maybe said the word 'juror' or something

41

on it" and "she may have said something about juror rights," but nobody had a chance to look at the printout because it was close to the juror at her desk ("I didn't see anyone look at it."). Juror 16 saw a juror holding some sort of printout from afar and overheard her say she was filling out a petition relating to jurors' right, but Juror 16 never saw the printout up close and did not see anyone else view it.

¶118 At the end of questioning, all jurors returned to the courtroom. The court reminded jurors to follow the admonition and asked jurors to raise their hands if they believed they could not follow the admonition or be fair and impartial based on what occurred thus far. No juror raised a hand.

¶119 The defense moved for a mistrial arguing that Juror 6 had exposed jurors "to potential taint that could affect their ability to be fair and impartial." The court denied the motion, explaining that jurors "were all very straightforward and with candor about being able to be fair and impartial and not having anything that happened this morning affect them at all." The "jurors were very honest with us" and "a lot of people made efforts to comply with the admonition [and] didn't really know how to react to . . . what [Juror 6] was doing."

¶120 McCauley moved to strike Juror 3 for cause, which the court granted over the State's objection.

¶121 When trial resumed (without Jurors 3 and 6), the court commended jurors and noted their efforts to follow the admonition and tell others not to talk about the case. The court also reminded jurors (1) to continue following the admonition; (2) that their notebooks had preliminary instructions about the admonition; (3) they "are to determine the facts only from the testimony of witnesses and from exhibits received in evidence"; (4) opening statements are not evidence; and (5) they are not to discuss a juror question with others before submitting it.

## 2. Failure To Properly Investigate Juror 6's Misconduct

¶122 "The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all

that is embraced in the constitutional concept of trial by jury." *Miller*, 178 Ariz. at 557 (internal quotation marks omitted) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472 (1965)). "The danger of compromising this integrity is never greater than when the process is contaminated by outside influences." *Id.* "In such a situation, the court's response should be 'commensurate with the severity of the threat posed.'" *Id.* (quoting *United States v. Thomas*, 463 F.2d 1061, 1063 (7th Cir. 1972)).

**¶123** McCauley argues the trial court did not properly investigate Juror 6's misconduct and relies on *Miller* in support of his claim. In *Miller*, after being dismissed at the close of evidence, an alternate juror left a note on the windshield of a still-seated juror that said "He's guilty" or "My vote is guilty." 178 Ariz. at 557. The still-seated juror did not disclose the note until after trial. *Id.* Once informed, defense counsel moved for an evidentiary hearing and a new trial. *Id.* Without questioning jurors, the trial court denied the motion because the prosecutor alleged the juror was not affected by the note and did not share it until after the verdict. *Id.* This Court found those measures inadequate: "Without questioning the jury, the court could not have known whether other jurors knew of the note or received similar communications from the alternate, and in either case, whether they were improperly influenced by him." *Id.* Also, "[t]he fact that the communication here related to the ultimate issue in the case—defendant's guilt or innocence—should have persuaded the judge that further inquiry was necessary." *Id.* This Court remanded for an evidentiary hearing because "the substantial risk of prejudice demanded something more than what the trial court did." *Id.*

**¶124** *Miller* is inapposite. Here, the printout about juror rights did not pertain to the issue of McCauley's guilt or innocence.[14] Also, the trial court here conducted a thorough investigation by questioning each juror individually and allowing both parties the opportunity for further questioning. The court asked questions about juror communications

---

[14] We also note that Juror 6's concerns focused on the prosecutor's actions in presenting admissible evidence during his opening statement, rather than McCauley's guilt or innocence.

regarding Juror 6's concerns, their knowledge of Juror 6's materials, and their ability to remain fair and impartial. Although certain jurors were not asked directly about the printout, any knowledge they may have had about it would have reasonably surfaced through the questioning that did take place.[15] The few jurors who saw Juror 6 with a printout indicated they did not read its contents and did not see any juror review it. Also, Juror 6 said no jurors responded when she mentioned she had looked up their rights.

**¶125** After this process, Jurors 3 and 6 were removed from the jury. Even if some remaining jurors initially found the opening statement disturbing, they confirmed they could remain fair and impartial and would follow the admonition. The trial court acted in a manner "commensurate with the severity of the threat posed," and there was no error. *See Miller*, 178 Ariz. at 557 (quoting *Thomas*, 463 F.2d at 1063).

### 3. Failure To Grant Mistrial Based On Juror Rights Printout

**¶126** McCauley also argues a mistrial should have been granted after Juror 6 brought the printout into the jury room. But a document about the rights of a juror is unlikely to contain information that a jury would consider in determining McCauley's guilt or innocence, or his punishment. *See State v. McLoughlin*, 133 Ariz. 458, 460 (1982). And even if it did, nothing in the record here indicates the content of the printout was received, read, discussed, or considered by jurors (other than Juror 6 who was excused). *See State v. Boag*, 104 Ariz. 362, 369 (1969) ("When there are no facts indicating that a juror looked at the [extrinsic evidence], the appellate court will not reverse merely on the grounds that they were available."); *Hall*, 204 Ariz. at 448 ¶ 19 (considering whether the material was actually received by the jury, and if so, the length of time it was available and extent to which jurors discussed and considered it).

---

[15] Contrary to McCauley's claim, the judge did not refuse to allow Juror 6 to speak freely. Also, McCauley claims "it is possible" Juror 6 left the document in the jury room for other jurors to review, but this is speculative and unsupported by the record.

**¶127**        This case is unlike *Hall*, where jurors received and considered extrinsic evidence about the defendant himself—information about his tattoos—and then looked for tattoos on a man who appeared on a video in evidence.  204 Ariz. at 442 ¶¶ 12–25.  This case is also unlike *Remmer v. United States*, where a person allegedly told the jury foreman "that he could profit by bringing in a verdict favorable to the petitioner," and the trial court did not conduct a hearing to determine the circumstances of the incident and its effect on the jury.  347 U.S. 227, 228–29 (1954).

**¶128**        The fact that Juror 6 had a juror rights printout does not involve private communication, contact, or tampering with a juror about a decision pending before the jury, such as a defendant's identity or a verdict.  *See id.* at 229.  Moreover, the trial court thoroughly investigated Juror 6's misconduct, reminded jurors about the admonition, and instructed them to determine the facts only from testimony and exhibits received in evidence.  *See Hall*, 204 Ariz. at 448 ¶ 19.  All remaining jurors confirmed they could remain fair and impartial and would follow the admonition.  *See id.* at 449 ¶ 23 ("In assessing juror misconduct, this court accords deference to the trial judge who held the evidentiary hearing and was in the best position to assess the effect of the extrinsic evidence.").  The record does not support a conclusion that the printout tainted the verdict, and the court did not err in denying the motion for mistrial.  *See State v. Poland*, 132 Ariz. 269, 283 (1982) (concluding extrinsic evidence did not have prejudicial impact on minds of jurors and did not contribute to verdict).

### 4.  Failure To Grant Mistrial Based On All Jurors' Conduct

**¶129**        McCauley argues a mistrial was warranted because all sixteen jurors violated their oath to "follow the court's instructions, including the admonition."  *See* Ariz. R. Crim. P. 18.6(b).  The court instructed the jury not to discuss the evidence until all evidence was presented and to advise the court immediately if any juror violated the admonition.  McCauley claims Juror 6 violated the admonition and the other jurors failed to immediately and on their own volition report the misconduct.

**¶130**        There was not a significant amount of off-the-record time that elapsed between Juror 6's conduct and the court being alerted to the matter and investigating.  But even if we deem the jurors to not have

"immediately" reported Juror 6, we note that (1) several jurors immediately told Juror 6 to not discuss the case; and (2) all jurors affirmatively complied with the admonition by providing relevant and responsive information when questioned in the courtroom shortly thereafter. The court observed that many jurors made efforts to comply with the admonition and were doing the best they could in this new situation. The court did not err. *See State v. Speer*, 221 Ariz. 449, 462 ¶ 72 (2009) ("Mistrial is the 'most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted.'" (quoting *State v. Dann*, 205 Ariz. 557, 570 ¶ 43 (2003))).

### 5. Failure To Grant Mistrial Based On Jurors 13 And 17

**¶131**          McCauley argues the trial court erred by not granting a mistrial because Jurors 13 and 17 violated the admonition when responding to Juror 6's concerns in violation of Rule 19.3(a), (c). *See* Ariz. R. Crim. P. 19.3 ("The court must admonish jurors not to: (a) converse among themselves or with anyone else on any subject connected with the trial until instructed to deliberate" or "(c) form or express any opinion about the case until it is finally submitted to them.").

**¶132**          Jurors 13 and 17 stated generally that evidence presented in the case may be disturbing, but it is probably pertinent to the trial. *Supra* ¶ 116. Jurors 13 and 17 did not express any opinion about the merits of the State's case. Indeed, at that point the jury had not yet received any evidence, and the preliminary jury instructions explained that ordinarily statements and arguments made by lawyers are not evidence. And in questioning, Jurors 13 and 17 affirmed they could be fair and impartial. The trial court observed the sincerity of the jurors' responses and again reminded them to follow the admonition.

**¶133**          The cases McCauley relies upon are inapposite. As discussed, *Miller* does not support a mistrial on this record, and neither does *State v. Gallardo*, 225 Ariz. 560 (2010). In *Gallardo*, this Court determined the trial court did not abuse its discretion by *granting* a mistrial. 225 Ariz. at 564–65 ¶¶ 6–9. There, the parties agreed one juror should be excused, and the court found (1) three jurors should be excused for cause; (2) three jurors formed opinions about other jurors that would affect their deliberations; and (3) it

was "highly likely" that four jurors violated the admonition despite having denied doing so. *Id.* Other than dismissal for cause of Jurors 3 and 6, none of these factors are present here.

**¶134** The trial court did not err. *See id.* at 564 ¶ 6 ("The decision to grant a mistrial rests within the sound discretion of the trial court.").

### 6. Failure To Grant Mistrial Based On Panel Being Tainted By And Complicit With Juror 6's Misconduct

**¶135** McCauley claims the trial court abused its discretion by not granting a mistrial because "the entire panel was tainted by and complicit with Juror 6's misconduct" and re-urges the issues previously addressed. As discussed, the record does not demonstrate that the court abused its discretion or that McCauley was deprived of a fair and impartial jury.

## D. Sufficiency Of The Evidence To Support The (F)(6) Aggravator

**¶136** McCauley claims the sole aggravator to support his death sentence—especially heinous or depraved—was not supported by sufficient evidence. *See* § 13-751(F)(6) (2012) (stating the trier of fact shall consider whether "[t]he defendant committed the offense in an especially heinous . . . or depraved manner"). He asks this Court to vacate his death sentence.

**¶137** We review a sufficiency of the evidence claim for abuse of discretion. *See State v. Gunches*, 225 Ariz. 22, 25 ¶ 14 (2010). In doing so, we review "'the record to determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict.'" *Id.* (quoting *Roque*, 213 Ariz. at 218 ¶ 93). "Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *Id.* (alteration in original) (quoting *Roque*, 213 Ariz. at 218 ¶ 93).

**¶138** "The terms 'heinous' and 'depraved' focus on the defendant's state of mind at the time of the offense." *State v. Greene*, 192 Ariz. 431, 439 ¶ 33 (1998). One of several factors we consider in determining whether a

47

murder was especially heinous or depraved is whether the defendant relished the murder. *Id.* At trial, the State argued that McCauley's texts and images established that he relished the murder. "'Relishing' refers to words or actions 'that show debasement or perversion.'" *Id.* at 440 ¶ 34 (quoting *State v. Roscoe*, 184 Ariz. 484, 500 (1996)). "The defendant must say or do something that indicates he savored the murder." *Id.*

¶139 McCauley claims the messages merely show bragging after the murder and are therefore insufficient to constitute relishing. But "[i]n some cases, bragging about a crime is sufficient proof of relishing where the defendant's statements provide clear insight into his state of mind at the time of the killing." *Id.* at 441 ¶ 40. Indeed, post-murder statements can constitute relishing "when they indicate, beyond a reasonable doubt, that the killer savored or enjoyed the murder at or near the time of the murder." *Id.* at 440–41 ¶ 39.

¶140 McCauley's messages sent mere minutes after the murder, among other things, told D.M.'s sister, "I just killed your seester" immediately followed by a smiley face text symbol; told D.M.'s daughter, "I just killed your mommy" and "Who's your daddy now bitch"; told D.M.'s mother, "I just killed your whore daughter" and included another smiley face text symbol; referenced "KARMA" in conjunction with the murder; stated that D.M. would "suck that dick"; and shared four sexually explicit images of D.M. These texts and images were not simply arrogant, proud, or boastful statements. They went beyond mere bragging or expressing satisfaction over the success of his plan. The contents of McCauley's messages expressed his savoring and enjoyment of his act of killing D.M., through words, images, and two smiley faces, and were calculated to inflict significant harm upon the recipients, D.M.'s family.

¶141 The texts and images McCauley sent to D.M.'s family constitute words and actions that show debasement and perversion. They are sufficient to establish relishing. *See Riley*, 248 Ariz. at 166 ¶ 5, 202 ¶ 205 (determining a "graphic and celebratory account of the murder" that described the killing and was signed with "a large smiley face" and "Your hero the butcher" was sufficient evidence of relishing); *State v. Runningeagle*, 176 Ariz. 59, 65 (1993) (concluding trial court did not err in finding "especially heinous or depraved" where defendant "laughed as

[he] came back to the car after having murdered" the victims and "also bragged to his girlfriend that he had been in a 'good fight'"); *State v. West*, 176 Ariz. 432, 448 (1993) (affirming especially heinous finding where defendant "told people that he 'beat the fuck out of some old man' and bragged about cuts and bruises on his hand coming from beating up 'the old man he ripped off'"); *State v. Bishop*, 127 Ariz. 531, 534 (1980) (explaining the defendant's post-murder words and actions can evidence his state of mind); *State v. Bearup*, 221 Ariz. 163, 173 ¶ 54 (finding "laughing while talking about cutting off a person's finger and [being] amused when he told his ex-girlfriend about his actions" were sufficient to establish relishing).

**¶142** McCauley also argues the texts were prepared before the murder and thus do not establish that he relished the murder at the time of the offense. But even assuming McCauley drafted the texts before the murder, his voluntary and separate act of sending the texts immediately after the murder was sufficient to establish relishing. By placing the applicable message and image into each separate text and hitting "send" on each text, McCauley thereby accepted, adopted, and delivered the contents of each text immediately after the murder.[16] Accordingly, they demonstrate that McCauley "savored or enjoyed the murder at or near the time of the murder." *Greene*, 192 Ariz. at 440–41 ¶ 39 (explaining a defendant's "state of mind may be inferred from behavior at or near the time of the offense" (quoting *State v. Martinez-Villareal*, 145 Ariz. 441, 451 (1985)).

**¶143** Finally, McCauley claims *State v. Ring* ("*Ring I*") supports a conclusion that his texts do not constitute relishing. 200 Ariz. 267 (2001), *rev'd on other grounds, Ring v. Arizona* ("*Ring II*"), 536 U.S. 584 (2002). In *Ring I*, the defendant was in a "pretty happy mood" the day after the robbery and murder because he "had all the money," and he said in an "offhand" manner, "you guys are forgetting something . . . you're forgetting to congratulate me on my shot." *Id.* at 281 ¶ 50. Although the defendant's statements reflected a calculated plan to kill, satisfaction over the apparent

---

[16] Accordingly, this is not a case involving only pre-murder conduct that solely demonstrates premeditation (not relishing). *See State v. Smith*, 146 Ariz. 491, 504 (1985); *State v. Madsen*, 125 Ariz. 346, 352 (1980).

success of his plan, and an extreme callousness or lack of remorse after the murder, they did not demonstrate that he "actually relished the *act* of murdering [the victim]." *Id.* ¶ 53. But here, as discussed, McCauley's texts and images sent mere minutes after the murder demonstrate that he actually savored and enjoyed the *act* of killing D.M. *Cf. Greene*, 192 Ariz. at 441 ¶ 40–41 (concluding letters sent one month after defendant's arrest and two weeks after his conviction did not show he actually enjoyed the killing or reveal his state of mind at or near the time of the killing). The evidence supports the jury's especially heinous or depraved verdict.

## E. Sufficiency Of Aggravation Phase Jury Instruction

¶144 McCauley argues the trial court committed fundamental error by giving a deficient especially heinous or depraved instruction that failed to properly define and narrow the conduct that constitutes "relishing." *See, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment . . . .").

¶145 "We review de novo whether jury instructions adequately state the law." *State v. Tucker*, 215 Ariz. 298, 310 ¶ 27 (2007). And we "consider the jury instructions as a whole to determine whether the jury received the information necessary to arrive at a legally correct decision." *State v. Dann*, 220 Ariz. 351, 363 ¶ 51 (2009).

¶146 The jury was instructed on "especially heinous or depraved":

> The term "especially heinous or depraved" focuses upon the defendant's state of mind at the time of the offense, as reflected by the defendant's words and acts. A murder is especially heinous if it is hatefully or shockingly evil, in other words, grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion, or deterioration. To determine whether a murder was "especially heinous or depraved," you must find that the State proved beyond a reasonable doubt that the defendant exhibited such a mental state at the time of the killing by engaging in the following action:

> Relished the murder.
>
> The defendant "relished the murder" if the defendant, by words or actions, savored the murder. These words or actions must show debasement or perversion, and not merely that the defendant has a vile state of mind or callous attitude.

The defense did not object. But, as it turns out, the jury instruction was missing one paragraph of the RAJI on relishing, which explains:

> Statements suggesting indifference, as well as those reflecting the calculated plan to kill, satisfaction over the apparent success of the plan, extreme callousness, lack of remorse, or bragging after the murder are not enough unless there is evidence that the defendant actually relished the act of murder at or near the time of the killing.

RAJI 1.6(d) (Criminal) 5th at 607.

**¶147**     Although the missing RAJI paragraph should have been provided, its omission did not make the jury instruction constitutionally defective. The missing RAJI paragraph does not affirmatively state what "relished the murder" means. Instead, it provides that certain statements do not constitute relishing "unless there is evidence that the defendant *actually relished the act of murder at or near the time of the killing.*" *See id.* (emphasis added).

**¶148**     The jury was instructed that the aggravating factor at issue—especially heinous or depraved—"focuses upon the defendant's *state of mind at the time of the offense*" and that to determine a murder was especially heinous or depraved, the jury:

> [M]ust find that the State proved beyond a reasonable doubt that the defendant exhibited such a mental state *at the time of the killing* by engaging in the following action: *Relished the murder*. The defendant "relished the murder" if the defendant, by words or action, *savored the murder*. These words or action

must show debasement or perversion, and not merely that the
defendant has a vile state of mind or callous attitude.

(Emphasis added.) Thus, even if the texts and images suggested
indifference, a calculated plan to kill, satisfaction over the apparent success
of his plan, extreme callousness, lack of remorse, or bragging after the
murder, the jury did not need the missing RAJI paragraph to understand
the murder would not be "especially heinous or depraved" unless the
evidence showed McCauley relished the murder at the time of the killing.

¶149 This case is unlike *State v. Hampton*, where the instruction
failed to specify that relishing focuses on the defendant's mental state *at or
near the time of the murder*, and thus "allowed the jury to find the (F)(6)
aggravator on the basis of 'relishing' that *may have occurred months after the
crime*." 213 Ariz. 167, 176 ¶ 37, 177 ¶¶ 40, 42 (2006) (emphasis added). As
discussed, McCauley's jury instruction did not have that same
shortcoming. Also, McCauley sent the texts and images mere minutes after
the murder, and thus the jury was not considering words or actions that
occurred months after the murder.

¶150 The jury instruction here sufficiently defined and narrowed
"especially heinous or depraved." *See Walton v. Arizona*, 497 U.S. 639, 654
(1990) (holding that Arizona's "especially heinous, cruel, or depraved"
aggravator was facially vague, but affirming the death sentence as "the
Arizona Supreme Court has sought to give substance to the operative
terms, and we find that its construction meets constitutional
requirements"), *overruled on other grounds by Ring II*, 536 U.S. at 608–09;
*Anderson*, 210 Ariz. at 353 ¶ 114 (observing that states have upheld findings
of "aggravators against vagueness attacks when jury instructions provided
adequate specificity in accordance with appellate courts' narrowing
constructions," and concluding the jury instructions "were adequate to
provide a narrowed construction of the facially vague statutory terms").
McCauley's jury instruction did not omit an element of the aggravator, and
"the jury received the information necessary to arrive at a legally correct
decision." *Dann*, 220 Ariz. at 363 ¶ 51. Also, for the reasons discussed,
McCauley's words and actions show debasement and perversion, and the
weight of the evidence shows that McCauley savored and enjoyed the act

of killing D.M. at or near the time of the murder. There is no fundamental, reversible error.

## F. The State's Disclosure Violation And The Court's Denial Of McCauley's Motion For Mistrial

¶151 McCauley claims the State's withholding of his criminal history report violated his constitutional rights and Arizona Rule of Criminal Procedure 15.1 (addressing the state's disclosure obligations). He also claims the court abused its discretion by denying his motion for mistrial.

¶152 We review alleged constitutional violations de novo. *State v. McGill*, 213 Ariz. 147, 157–58 ¶ 45 (2006). We review the legal scope of disclosure under Rule 15 de novo, but review the judge's rulings for abuse of discretion. *Johnson*, 247 Ariz. at 193 ¶ 82. We also review for abuse of discretion the denial of a motion for mistrial. *Bush*, 244 Ariz. at 594 ¶ 80.

¶153 As discussed in Part (A)(3)(b), the State disclosed the criminal history report to the defense in the middle of the penalty phase. The defense moved for a mistrial, arguing the late disclosure of the 1991 conviction was consequential because (1) a core issue is whether McCauley was convicted of domestic violence against his first wife, as he was on trial for murdering his second wife; (2) defense counsel would have taken a different approach had they known about the 1991 conviction; and (3) the prosecutor's questions to Dr. Toma implied untruthfulness on McCauley's part.

¶154 The trial court denied the motion for mistrial but precluded the State from introducing any evidence of the 1991 conviction. The court observed that the jury had not received evidence of a conviction, and the jury was instructed that opening statements and questions to witnesses are not evidence. Moreover, the court noted that the prosecutor's question to Dr. Toma ("He didn't tell you that he pled guilty to that offense, did he?") was "somewhat ambiguous" and there are different "implications to that question" (one is that McCauley did not plead guilty to the offense and had nothing to report, and another is "that maybe he pled guilty to the offense"). The court decided this "one ambiguous question" did not require a mistrial.

### 1. Disclosure Obligations Under Rule 15.1

**¶155**    As discussed, the prosecutor planned to call the detective to testify about what he found in his research, which included the fact of a conviction in a criminal history report, and the prosecutor intended to use the report to refresh the detective's recollection. *Supra* ¶ 42. That criminal history report should have been disclosed, as the State intended to use it in the penalty phase. *See* Ariz. R. Crim. P. 15.1(i)(4)(D) ("[T]he State must disclose the following to the defendant: . . . a list of all documents . . . the State intends to use during the aggravation and penalty hearings."); Ariz. R. Crim. P. 15.1(b) ("[T]he State must make available to the defendant the following material and information within the State's possession or control: . . .(7) a list of the defendant's other acts the State intends to use at trial.").

**¶156**    The State, through its detective, was in possession of the criminal history report about a year before trial. *Supra* ¶ 42. The prosecutor purportedly became aware of the report right before the penalty phase. *Id.* Once the prosecutor became aware of it and planned to use it, he should have immediately notified defense counsel so the parties could jointly discuss next steps before opening statements, including the possibility of court involvement. Even with concerns of confidentiality, the prosecutor could have requested a court order permitting disclosure or a protective order. *See* Ariz. R. Crim. P. 15.5. Indeed, the State acknowledged at oral argument that the criminal history report should have been disclosed earlier than it was. We conclude the State failed to comply with Rule 15.1's disclosure obligations.

**¶157**    Arizona Rule of Criminal Procedure 15.7(c) outlines various sanctions a court may impose for nondisclosure or an untimely disclosure, such as "precluding . . . the use of evidence" at trial, "declaring a mistrial if necessary in the interests of justice," or "any other appropriate sanction." "But any sanction must be proportional to the violation and must have 'a minimal effect on the evidence and merits.' Factors to consider include importance of the witness or evidence, the degree of surprise, and bad faith." *Payne*, 233 Ariz. at 518 ¶ 155 (internal citation omitted) (quoting *State v. Towery*, 186 Ariz. 168, 186 (1996)).

**¶158**         The court's decision to preclude evidence of the 1991 conviction (rather than granting a mistrial) was a proportional sanction based on the circumstances.  First, the jury never received evidence that McCauley was convicted of a crime related to his ex-wife.  Second, defense counsel told jurors McCauley had not been "convicted of anything since he was 18 to 20 years old," and the jury never received any evidence to the contrary.  Third, as to the prosecutor's brief comment and question to Dr. Toma, the jury was instructed that questions to witnesses and attorney remarks, statements, and arguments are not evidence.  *See State v. Manuel*, 229 Ariz. 1, 6 ¶ 24 (2011) ("Such cautionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements" and "[j]urors are presumed to follow the court's instructions.").  Fourth, Dr. Toma was asked whether McCauley disclosed that he pled guilty, he answered "no," and the jury never received any evidence that McCauley pled guilty.[17]  Fifth, there is no evidence to refute the prosecutor's statement that he was unaware of the criminal history report until right before the penalty phase.  Sixth, the late disclosure related to McCauley's *own* conviction.

**¶159**         "Imposition of sanctions for nondisclosure pursuant to the discovery rules is a matter to be resolved in the sound discretion of the trial court and that decision should not be disturbed absent a clear abuse of discretion."  *Martinez-Villareal*, 145 Ariz. at 448.  Also, "for a reviewing court to find an abuse of discretion, appellant must demonstrate that he suffered prejudice by nondisclosure.  Such prejudice relates to the issue of surprise or delay under the discovery rules."  *Id.* (internal citation omitted).  Here, the court ordered an appropriate remedy by precluding all evidence of the 1991 conviction, and there was no prejudice to McCauley on account of the late disclosure.  The court did not abuse its discretion in declining to grant a mistrial.  *See State v. Armstrong*, 208 Ariz. 345, 354 ¶ 40 (2004) ("We will

---

[17] This was not a question about a "long criminal record" followed by an immediate objection by the defense, as in *State v. Holsinger*, 124 Ariz. 18, 20–21 (1979).  The defense did not object to the question to Dr. Toma.

not find that a trial court has abused its discretion unless no reasonable judge would have reached the same result under the circumstances.").

## 2. Alleged Constitutional Violations For Untimely Disclosure

**¶160** McCauley argues the prosecutor's withholding of the criminal history report violated his constitutional rights, and relies on *Gardner v. Florida*, 430 U.S. 349 (1977) and *Brady v. Maryland*, 373 U.S. 83 (1963) in support of this claim.

**¶161** The "sentencing process . . . must satisfy the requirements of the Due Process Clause." *Gardner*, 430 U.S. at 358. In *Gardner*, when the judge imposed the death sentence, he stated he was relying in part on information in a presentence investigation report, portions of which were never disclosed to counsel for the parties. *Id.* at 351. This violated due process because it allowed the death sentence to be "imposed, at least in part, on the basis of information which [defendant] had no opportunity to deny or explain," and thus the death sentence was vacated. *Id.* at 362. There was no similar constitutional violation here, as the jury never received the criminal history report or evidence of the 1991 conviction. Unlike in *Gardner*, McCauley did not have a need to "challenge the accuracy or materiality of any such information." *See id.* at 356.

**¶162** McCauley further argues the State violated *Brady* by not disclosing evidence that his conviction was set aside and that no records showed he had pled guilty. 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

**¶163** McCauley claims the State's "decision to withhold favorable evidence robbed [him] of the opportunity to rebut the State's penalty phase

case," such that had the prosecutor timely disclosed the criminal history report, "the jury would likely never have learned of the alleged conviction."

**¶164** We disagree the criminal history report—documenting a misdemeanor assault conviction that was later set aside—is evidence favorable to McCauley as either exculpatory or impeaching in this trial for first degree murder. Although the report notes "Judgment of Guilt Set Aside Per [A.R.S. §] 13-907" (renumbered to A.R.S. § 13-905 in 2019), a "set aside" conviction continues to carry significant negative legal consequences for the convicted person, including the possibility of being (1) used as a conviction if the conviction would be admissible had it not been set aside; (2) pleaded and proved in any subsequent prosecution of the person for any offense; and (3) used in department of transportation enforcement proceedings. *See* § 13-905(E); § 13-907 (1991). Under the circumstances, the criminal history report is not favorable to McCauley within the meaning of *Brady*. *Cf. California v. Trombetta*, 467 U.S. 479, 485 (1984) (discussing due process notions of fundamental fairness and delivery of "exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system").

**¶165** But even if we deem the criminal history report favorable to McCauley in some way, his *Brady* claim fails because the report was not material to his guilt or punishment. *See Smith v. Cain*, 565 U.S. 73, 75 (2012) ("Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment."). There is not "a reasonable probability that, had the evidence been disclosed [earlier], the result of the proceeding would have been different." *See id.* at 75 (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). McCauley's desire to prepare an earlier rebuttal to the 1991 conviction does not create a sufficient likelihood of a different result to undermine confidence in the outcome of the trial. *See id.* at 75–76. The untimely disclosure did not result in a violation of McCauley's constitutional rights.

## G. Allowing Dr. DeMarte To Answer A Juror Question

¶166       McCauley claims the trial court improperly allowed Dr. DeMarte to answer a juror question. "We review a trial court's rulings with respect to answering jury questions for an abuse of discretion." *See Manuel*, 229 Ariz. at 8 ¶ 35.

¶167       In the penalty phase, the prosecutor asked Dr. DeMarte to read portions of (1) the notes of defense mitigation specialist, Dr. Ellis, from Dr. Ellis's interview with McCauley's ex-wife; and (2) a transcript of a detective's interview with his ex-wife. According to Dr. Ellis's notes, McCauley's ex-wife claimed he would beat her up out of jealousy and once tried to kill her. The prosecutor also asked Dr. DeMarte whether McCauley's ex-wife discussed with the detective "forced sexual contact on her by" McCauley; Dr. DeMarte responded, "[s]he did." Dr. DeMarte later testified that when she spoke with McCauley, he denied engaging in sex with his ex-wife without her consent.

¶168       On cross-examination, the defense asked Dr. DeMarte to read from a transcript of defense counsel's interview with McCauley's ex-wife. In that interview, she explained her previous comment that McCauley had raped her. She stated it would occur at night when he wanted sex and she didn't; it felt like he would rape her, which meant she felt forced because it wasn't something she wanted to do. She did it just "to keep things mellow," but it was not bad enough to call the police.

¶169       Dr. DeMarte also read from the sworn declaration of McCauley's ex-wife, in which she stated: (1) "In a previous interview, I stated that [McCauley] would rape me. I should not have used the term 'rape' as I was only referring to times when I would not want to have sex with [him] when [he] would"; and (2) McCauley "was not a violent person," "I was not afraid of him," and he "never threatened to kill me."

¶170       A juror submitted a question to Dr. DeMarte: "If a person is too scared to say no to sex, even if it is their husband, could the feeling of not being able to refuse sex have a similar psychological impact of being raped?" The defense objected, but the court allowed her to answer. Dr. DeMarte then answered:

Yes. I mean, rape is when the person doesn't offer consent. And so feeling like you can't say no can certainly have an emotional impact on the person.

Can I say that it would be the exact emotional impact as someone jumping out of the bushes and raping someone? I can't say that because what we do know is that when people are raped with very similar scenarios, their responses are different. It just goes to show how different people are, how their backgrounds influence their ability to cope and their ability to have experiences. It just varies across people.

In closing, defense counsel argued that McCauley's ex-wife lacked credibility due to her inconsistencies, and her sworn declaration was the closest to the truth.

¶171 On appeal, McCauley argues Dr. DeMarte lacked foundation to answer the question. Dr. DeMarte has a doctorate degree in clinical psychology. Her experience includes four years practicing psychology under a licensed psychologist, working as a clinical psychologist and becoming a clinical director where she oversaw psychiatrists, therapists, and other psychologists, and owning her practice. Her work includes forensic evaluations and clinical work. Dr. DeMarte's education, training, and experience qualified her to answer the question. *See* Ariz. R. Evid. 702; *State v. Romero*, 239 Ariz. 6, 10 ¶¶ 17–18 (2016).

¶172 McCauley also argues the question was irrelevant and unduly prejudicial. But his ex-wife's inconsistent statements about rape were at issue, and the question sought to help the jury understand the responses of people who feel they cannot refuse sex. The question served the relevant purpose of helping jurors evaluate and understand issues relating to credibility. *See* Ariz. R. Evid. 401, 402; *State v. Haskie*, 242 Ariz. 582, 586 ¶ 16, 587 ¶ 20 (2017) (explaining "expert testimony that explains a victim's seemingly inconsistent behavior is admissible to aid jurors in evaluating the victim's credibility"); *State v. Lindsey*, 149 Ariz. 472, 473-74 (1986); *State v. Huey*, 145 Ariz. 59, 62–64 (1985) (noting expert testimony on response of rape victims was admissible where issue was lack of consent). Also, the question and answer were not unduly prejudicial, as jurors had heard his

ex-wife's inconsistent statements, and Dr. DeMarte did not opine on the accuracy or reliability of her statements, or her credibility. *See* Ariz. R. Evid. 403; *State v. Boggs*, 218 Ariz. 325, 335 ¶ 39 (2008) ("Arizona prohibits lay and expert testimony concerning the veracity of a statement by another witness.").

¶173 Finally, McCauley claims the question improperly called for a legal conclusion that bolstered his ex-wife's credibility. But the question and answer did not address a legal definition of rape, whether McCauley had raped his ex-wife, or her specific statements. Dr. DeMarte merely noted a common understanding of rape and discussed the varied responses of people who feel unable to decline sex. The question and answer did not impermissibly bolster his ex-wife's credibility. The trial court did not err in allowing Dr. DeMarte to answer the question.

## H. Sufficiency Of Mitigation Jury Instruction

¶174 McCauley claims the jury was prevented from considering and giving effect to his mitigation evidence because the jury instructions listed only certain mitigating circumstances and the prosecutor told jurors the listed circumstances were "designated." We review constitutional issues and purely legal issues de novo. *Moody*, 208 Ariz. at 445 ¶ 62; *Glassel*, 211 Ariz. at 53 ¶ 74 (stating we review whether jury instructions properly state the law de novo).

¶175 At trial, the defense asked to individually list each of McCauley's twenty-three proposed mitigating circumstances in the final jury instructions. The court agreed to specifically include some that were proposed but declined to include others that were "a little bit argumentative and factually-disputed." The court noted the instructions already broadly covered the mitigating circumstances he wished to argue.

¶176 The jury received the following instruction:

The circumstances proposed as mitigation by the defendant for your consideration in this case include, but are not limited to, defendant's confession and cooperation with law enforcement, significant impairment, mental health issues or

disorders, a criminal record, or lack of a criminal record, substance abuse issues, family dysfunction, lack of education, work history, defendant's age, and/or family or environmental upbringing.

You are not limited to these proposed mitigating circumstances in considering the appropriate sentence. You may also consider anything related to the defendant's character, propensity, history or record, or circumstances of the offense. You may consider any mitigating evidence in deciding whether leniency is appropriate.

¶177        In closing, the prosecutor read the factors in the first paragraph and then said: "Those are the issues that were designated.  Of course, you're not restricted to that list, but those are the issues that are designated."  He later said: "There's also the statement that he's a good family man.  And, again, these are just miscellaneous things that were thrown out during the closing argument, not necessarily in the jury instructions."  The defense did not object to either statement.

¶178        "The consistent concern in the penalty phase is 'that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.'"  *Johnson*, 212 Ariz. at 437 ¶ 43 (quoting *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998)); *see also Boyde v. California*, 494 U.S. 370, 380 (1990) (explaining where instruction is alleged to be ambiguous and subject to erroneous interpretation, the inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence").

¶179        The jury instruction here did not misstate the law, foreclose the jury from considering or giving effect to McCauley's mitigation evidence, or improperly give unequal effect to certain mitigating circumstances.  The jury was instructed that the mitigating circumstances proposed by McCauley "include, but are not limited to" certain circumstances, but jurors were "not limited to these proposed mitigating circumstances."   Jurors may also consider "anything related to [his]

character, propensity, history or record, or circumstances of the offense" and "any mitigating evidence in deciding whether leniency is appropriate."

¶180 A jury instruction is not unconstitutional because it contains a non-exhaustive list of proposed mitigating circumstances. *See Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990) (rejecting defendant's claim that court's list of statutory mitigating factors improperly foreclosed jury's consideration of other mitigating factors, where jurors were told they could consider the matters listed and "any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense"). And here, McCauley presented his mitigation evidence, including testimony and exhibits, over the course of eight days (the entire penalty phase was fifteen days). The context of the entire penalty phase would lead reasonable jurors to believe they could consider and give effect to all of McCauley's mitigation evidence. *Buchanan*, 522 U.S. at 278 (explaining it is "unlikely that reasonable jurors would believe that the court's instructions transformed four days of defense testimony on the defendant's background and character 'into a virtual charade'" (quoting *Boyde*, 494 U.S. at 383)).

¶181 Contrary to McCauley's claim, the jury instruction complied with *Johnson*. In *Johnson*, this Court rejected the defendant's claim that "a trial court should be required to provide a list of specific mitigating factors to the jury," as such specificity "'would be inharmonious with the Supreme Court's admonitions that the sentencer be free to consider *any* relevant mitigating factor.'" 212 Ariz. at 437 ¶ 47 (quoting *Tucker v. Zant*, 724 F.2d 882, 892 (11th Cir. 1984)). *Johnson* reiterated "that the Eighth Amendment does not require 'that a capital jury be instructed on the concept of mitigating evidence generally, or on particular statutory mitigating factors.'" *Id.* ¶ 44 (quoting *Buchanan*, 522 U.S. at 270). The trial court did not err in declining to instruct the jury on all twenty-three proposed mitigating circumstances.[18]

---

[18] Also, the jury instruction was not "internally contradictory" such that it was "logically and ethically impossible for a juror to follow" the instruction. *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (concluding a supplemental

**¶182** McCauley also contends the prosecutor's "designated" comment implied those mitigating circumstances carried more weight and the imprimatur of the court, thereby invading the jury's province, and prevented the jury from giving effect to his mitigation evidence. He claims this problem was further highlighted by the prosecutor's comment about "miscellaneous things that were thrown out during the closing argument, not necessarily in the jury instructions."

**¶183** The prosecutor's "issues that are designated" statement was improper. There were no "designated" mitigation circumstances. The jury was not limited to mitigating circumstances listed in the instruction, and it was up to each individual juror to decide whether a particular mitigating circumstance existed based on the evidence presented. Because the defense did not object, we review for fundamental error.

**¶184** The jury instructions explicitly informed jurors they were "not limited to these proposed mitigating circumstances in considering the appropriate sentence" and they "may consider any mitigating evidence," including "anything related to the defendant's character, propensity, history or record, or circumstances of the offense." *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68 (2006) ("We presume that the jurors followed the court's instructions."); *see also Boyde*, 494 U.S. at 384 (stating "arguments of counsel generally carry less weight with a jury than do instructions from the court"). Also, the prosecutor's statement was brief, and he simultaneously told jurors they were "not restricted to that list." Further, McCauley's lawyer later reminded the jury that mitigation is up to each juror and asked them to look at McCauley's entire life. There is no reasonable likelihood that the prosecutor's brief statement caused jurors to not consider or give effect to McCauley's mitigation evidence that he directly presented over the course of eight days, contrary to the jury instructions they received. The statement was not fundamental, reversible error.

---

instruction and special issue instruction together made "the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation").

## I.   Abuse Of Discretion By Jury In Imposing Death Sentence

¶185      This Court "review[s] all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death."   A.R.S. § 13-756(A). McCauley argues the jury abused its discretion by relying on an invalid aggravating circumstance and failing to find the substantial weight of mitigation called for leniency.

¶186      "We will uphold the jury's findings of aggravating circumstances 'if there is any reasonable evidence in the record to sustain it.'"   *Johnson*, 247 Ariz. at 210 ¶ 193 (quoting *Morris*, 215 Ariz. at 341 ¶ 77). As discussed in Part D, substantial evidence supports the (F)(6) aggravator. *See id.*; *see also* § 13-756(A).

¶187      "We must uphold a death sentence 'if any reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency.'"   *State v. Allen*, 248 Ariz. 352, 366 ¶ 52 (2020) (quoting *State v. Rushing*, 243 Ariz. 212, 223 ¶ 45 (2017)).   McCauley presented evidence of various mitigating circumstances that he argued supported leniency, including a prior TBI that led to organic brain damage and poor emotional control, a major depressive disorder with psychotic features that diminished his capacity to appreciate the wrongfulness of his conduct, marijuana use, lack of a personality disorder, life stressors, family background, status as a good provider, work history, age, poor health, and childhood upbringing.   The State presented evidence on rebuttal that undermined the impact of much of McCauley's mitigation evidence, including that his brain injury and depression were not as severe as he claimed.   A reasonable juror could have concluded that McCauley's evidence, even if mitigating, was not sufficiently substantial to warrant leniency.  The jury did not abuse its discretion in finding that death was the appropriate sentence for D.M.'s murder.  *See* § 13-756(A).

## J.  McCauley's Other, Undeveloped Constitutional Claims

¶188      McCauley lists twenty other claims that he acknowledges this Court has previously found do not constitute constitutional violations.  He

does not develop these claims but merely seeks to preserve them for federal review.  We decline to address these claims.

**CONCLUSION**

**¶189**         We affirm McCauley's conviction for first degree murder and the imposition of the death sentence.

BOLICK, J., concurring:

**¶190**      I write separately because the jury instructions misstated the law.  It is a capital aggravator if "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner."  A.R.S. § 13-751(F)(6) (2012).[19]  The State alleged all three prongs of the (F)(6) aggravator, yet the jury instructions and verdict form conflated especial heinousness and especial depravity into a single prong.  Nevertheless, because McCauley invited the error by requesting the jury instruction, and indeed may have waived the argument, I fully concur in the majority opinion.

**¶191**      In this case, the aggravation-phase jury instructions provided:

> **<u>DEFINITION OF "ESPECIALLY CRUEL, HEINOUS OR DEPRAVED"</u>**
>
> . . . .
>
> The terms "especially cruel," or "especially heinous or depraved" are considered separately; therefore, the presence of any one circumstance is sufficient to establish this aggravating circumstance. However, to find that this aggravating circumstance is proven, you must find that "especially cruel" has been proven unanimously beyond a reasonable doubt or that "especially heinous or depraved" has been proven unanimously beyond a reasonable doubt.
> **Especially Cruel**
>
> . . . .
>
> **Especially Heinous or Depraved**
>
> The term "especially heinous or depraved" focuses upon the defendant's state of mind at the time of the offense, as reflected by the defendant's words and acts. A murder is especially heinous if it is hatefully or shockingly evil, in other words, grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion or deterioration. To determine whether a murder was

---

[19]  All references to § 13-751 refer to the 2012 version.

"especially heinous or depraved," you must find that the State proved beyond a reasonable doubt that the defendant exhibited such a mental state at the time of the killing by engaging in the following action:

Relished the murder.

**Relished the Murder**

The defendant "relished the murder" if the defendant, by words or actions, savored the murder. These words or actions must show debasement or perversion, and not merely that the defendant has a vile state of mind or a callous attitude.

A unanimous finding of "especially cruel" and/or 'especially heinous' or 'depraved' established this aggravating circumstance.[20]

**¶192** Further, the aggravation-phase verdict form required the jury to indicate, if the jury found the (F)(6) aggravator to be proven, whether they unanimously found beyond a reasonable doubt that the murder was committed in an "especially cruel manner" and whether they unanimously found beyond a reasonable doubt that the murder was committed in an "especially heinous or depraved manner." If the jury found the murder "especially heinous or depraved," the jury was not required to specify whether they found the murder was committed in an especially heinous manner, an especially depraved manner, or both. In this way, the instructions conflated the three distinct factors.

---

[20] The jury instructions were consistent with the Revised Arizona Jury Instructions ("RAJI"), except for the omission noted by the majority. *See supra* ¶¶ 145–46. The State Bar of Arizona writes the RAJI, and this Court does not offer approval for the RAJI's phrasing or accuracy. *See State v. Logan*, 200 Ariz. 564, 566 ¶ 12 (2001). We have previously found that the RAJI is incorrect or misleading on other points of law. *See State v. Hunter*, 142 Ariz. 88, 90 (1984); *State v. Slemmer*, 170 Ariz. 174, 177–78 (1991); *State v. Portillo*, 182 Ariz. 592, 596–97 (1995); *State v. Johnson*, 247 Ariz. 166, 185 ¶ 43 (2019); *State v. Miller*, 251 Ariz. 99, 103 ¶¶ 11, 14–15, 104 ¶ 16 (2021).

¶193        Giving separate meaning to all three prongs of the (F)(6) aggravator is not a matter of splitting hairs. Rather, doing so is crucial to the statute's survival and mandatory under separation of powers.

¶194        Judicial rewriting of the (F)(6) factor places the aggravator's viability in jeopardy. This concern is serious because defendants regularly argue the (F)(6) aggravator is unconstitutional. *See, e.g.*, *State v. Gretzler*, 135 Ariz. 42, 50 (1983); *State v. Ortiz*, 131 Ariz. 195, 206 (1981). In *Walton v. Arizona*, 497 U.S. 639, 654 (1990), the Supreme Court of the United States held Arizona's (F)(6) aggravator was facially vague. Nevertheless, the Court affirmed a death sentence imposed based on a finding of the (F)(6) aggravator because this Court had narrowly construed the aggravator and independently confirmed that it was proven beyond a reasonable doubt. *Id.* at 653–56. In *Walton*, this Court treated the heinousness and depraved prongs of the (F)(6) aggravator as separate prongs. *See State v. Walton*, 159 Ariz. 571, 587 (1989) ("We have often emphasized that the statutory expression of 'especially heinous, cruel, or depraved' is phrased in the disjunctive, hence a finding of any one of those three factors suffices to constitute an aggravating circumstance." (internal citation omitted)). As discussed below, some courts have treated heinousness and depravity as separate prongs, whereas other courts have treated heinousness and depravity as a single prong. Disparate application of the (F)(6) aggravator could render it unconstitutional under the Eighth and Fourteenth Amendments.

¶195        Further, reducing heinousness and depravity to a single prong requires judicial rewriting of § 13-751(F)(6) which flouts our separation of powers scheme. As I will discuss below, the plain text of § 13-751(F)(6) demands separate consideration for each of its prongs. Judges are not at leisure to rewrite statutes. This Court's lodestar, the Arizona Constitution, expressly prohibits the judicial department from exercising the legislative power. Ariz. Const. art. 3. Further, Arizona adopts "[t]he common law only so far as it is . . . not repugnant to or inconsistent with the Constitution of the United States or the constitution or laws of this state." A.R.S. § 1-201 (2012). We must apply the law as it is written by the legislative branch.

¶196          Finally, failure to require a jury to specify whether they found a murder to be especially heinous, especially depraved, or both creates a risk that death sentences may be imposed based on a non-unanimous finding of aggravating circumstances.  "If the trier of fact is a jury, a unanimous verdict is required to find that the aggravating circumstance has been proven."  A.R.S. § 13-752(E) (2012).  The (F)(6) aggravator is only proven if the jury unanimously agrees which of its prongs are satisfied. *Anderson*, 210 Ariz. at 355–56 ¶¶ 127–30 (2005).  Thus, jury instructions should clearly communicate that the heinousness and depravity prongs are separate, and verdict forms should require juries to specify which of the (F)(6) aggravator's prongs they unanimously find satisfied.  For all of these reasons, this Court's interpretation of § 13-751(F)(6) is of utmost importance.

¶197          Jury instructions must state the law accurately.  To determine whether the jury instructions adequately stated the law, I begin with the plain language of § 13-751(F)(6).  As this Court has observed, "[o]ur task in statutory construction is to effectuate the text if it is clear and unambiguous."  *BSI Holdings LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 19 ¶ 9 (2018).  Accordingly, § 13-751(F)(6)'s text bears repeating: it is a capital aggravator if "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner."

¶198          By its use of the word "or," the (F)(6) aggravator is written in the disjunctive, so "heinous," "cruel," and "depraved" are best understood as discrete terms.  "Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) (emphasis in original).  Thus, § 13-751(F)(6)'s plain text indicates that "heinous," "cruel," and "depraved" are three alternatives which constitute the (F)(6) aggravator.  This interpretation is not unprecedented.  "We have often emphasized that the statutory expression of 'especially heinous, cruel, or depraved' is phrased in the disjunctive, hence a finding of any one of those three factors suffices to constitute an aggravating circumstance."  *Walton*, 159 Ariz. at 587 (internal citation omitted); *see also, e.g.*, *State v. Stokley*, 182 Ariz. 505, 517 (1995) ("The heinous, cruel, or depraved circumstance is phrased in the disjunctive, so if any one of the three factors is found, the circumstance is satisfied."); *State v. Brewer*, 170 Ariz. 486, 501 (1992) ("The

legislature phrased the 'heinous, cruel *or* depraved' . . . circumstance in the disjunctive, so we may find aggravation if the evidence establishes any one of the three factors."); *State v. Montoya*, 258 Ariz. 128, 143 ¶ 16 (2024) ("Because the (F)(6) aggravator is written in the disjunctive, the State need only establish that the murder was especially heinous *or* especially cruel *or* especially depraved to support a finding of the aggravating circumstance." (internal citation omitted)).

¶199 Additionally, this Court should give "heinous," "cruel," and "depraved," distinct meanings to avoid rendering any of the terms surplusage. Under the surplusage canon, "every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia & Garner, *supra* ¶ 198, at 174. Again, this interpretation is not novel. This Court gave "heinous," "cruel," and "depraved" separate meanings in *State v. Knapp*, 114 Ariz. 531, 543 (1977). This Court defined "heinous" as "hatefully or shockingly evil" or "grossly bad"; "cruel" as "disposed to inflict pain esp. in a wanton, insensate or vindictive manner" or "sadistic"; and "depraved" as "marked by debasement, corruption, perversion or deterioration." *Id.*; *see also, e.g.*, *State v. Ceja*, 126 Ariz. 35, 39–40 (1980) (using the definitions provided in *Knapp* to determine whether a murder was especially heinous, especially cruel, or especially depraved).

¶200 Of course, some murders may satisfy all three prongs. *See, e.g.*, *Knapp*, 114 Ariz. at 534, 543 (finding a defendant who murdered his infant children by incinerating them committed the murders in an especially heinous, cruel, and depraved manner, noting it would be hard to think of "a more ghastly death than this for anyone"). But this is not always the case. Because heinous and depraved have different meanings, some murders are marked by especial heinousness but not especial depravity, whereas others are marked by especial depravity but not especial heinousness. *See, e.g.*, *State v. Clark*, 126 Ariz. 428, 436 (1980) (finding murder was especially depraved but not especially heinous); *Walton*, 159 Ariz. at 587 (finding murder was especially depraved but not especially heinous); *State v. West*, 176 Ariz. 432, 448 (1993) (finding murder was especially heinous but not especially depraved); *Montoya*, 258 Ariz. at 166 ¶ 123 (defendant pleaded guilty to (F)(6) aggravator on basis that murder was especially heinous and cruel but not especially depraved).

¶201    Accordingly, especial heinousness, especial cruelty, and especial depravity represent three distinctive alternatives, each of which is sufficient on itsown to support a finding of the (F)(6) aggravator.

¶202    Despite the foregoing, this Court has sometimes treated whether a murder was committed in an especially heinous and an especially depraved manner as a single inquiry.  For example, in *State v. Womble*, 225 Ariz. 91, 100 ¶ 34 (2010), this Court stated, "[w]hile the terms 'heinous or depraved' are written in the disjunctive, they, in fact, constitute one prong."  This interpretation lacks any support.

¶203    As an initial matter, it is textually implausible that the Legislature intended heinousness and depravity to be interpreted as one prong, and cruelty to be interpreted as another prong.  Notably, "heinous" and "depraved" are not even next to each other in § 13-751(F)(6)—they are separated by "cruel."  If any conflation is necessary, it would be more natural to combine the determination of neighboring terms (i.e. "heinous" and "cruel"; or "cruel" and "depravity").  Thus, it defies reason to treat cruelty as its own prong and at the same time conflate heinousness and depravity.  The conjunctive/disjunctive and surplusage canons either apply or they do not, and I would find that they apply in full force to all three terms, as many cases have recognized.

¶204    Our cases that conflate especial heinousness and especial depravity offer no rationale for doing so.  The conflation can be traced back to a misreading of *Gretzler* which non-exhaustively summarized the sorts of facts that could support a finding of the (F)(6) aggravator.  135 Ariz. at 51–53.  In doing so, the Court stated the same facts (relishing, gratuitous violence, needless mutilation, senselessness, and helplessness) could lead to a finding that a murder was especially heinous or especially depraved. *Id.*

¶205    It is intuitive that some overlap will exist between the facts that may support a finding of heinousness and those that may support a finding of depravity because, although cruelty relates to "the pain and distress visited upon the victims," heinousness and depraved both relate to "the mental state and attitude of the perpetrator as reflected in his words

and actions." *Id.* at 51; *but see Ortiz*, 131 Ariz. at 206 ("Cruelty focuses on the sensations of the victim before death, depravity focuses on the murderer's state of mind, and heinousness focuses on society's view of the murder as compared to other murders.").

**¶206** But *Gretzler* did not hold that especial heinousness and especial depravity were one prong. In fact, the Court expressly stated it was "not necessary that all three elements, heinous, cruel, or depraved, be present in the murder. The statutory expression is in the disjunctive, so either all or one could constitute an aggravating circumstance." *Gretzler*, 135 Ariz. at 51 (quoting *Clark*, 126 Ariz. at 436). Further, the Court quoted *Knapp*'s distinct definitions for "heinous," "cruel," and "depraved." *Id.* Finally, *Gretzler* noted *Clark*, which found a murder was especially depraved but not especially heinous. *Id.* at 52. Thus, *Gretzler* does not provide a compelling basis to treat heinousness and depravity as a single prong. The terms are similar, but not synonymous.

**¶207** Ultimately, the cases that combine the heinousness and depravity determinations fly in the face of the plain text of § 13-751(F)(6), ignore a great body of cases that expressly acknowledge that heinousness and depravity are separate prongs, and lack any rationale for doing so.

**¶208** Because the jury instructions treated especial heinousness and especial depravity as a single prong, they misstated the law. For the foregoing reasons, courts should take care to differentiate these elements. However, I would find the error did not rise to the level of reversible error because McCauley invited the error by requesting the jury instruction. *See State v. Logan*, 200 Ariz. 564, 565–66 ¶ 9 (2001) ("If an error is invited, we do not consider whether the alleged error is fundamental, for doing so would run counter to the purposes of the invited error doctrine. Instead, as we repeatedly have held, we will not find reversible error when the party complaining of it invited the error."); *State v. Dutton*, 106 Ariz. 463, 466 (1970) (refusing to consider a defendant's argument on appeal that the jury instructions requested by the defendant at trial misstated the law). Moreover, McCauley may have waived the argument altogether. Accordingly, I fully concur in the majority opinion.